**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

CASEY'S GENERAL STORES, INC.,

                                    Plaintiff,

              -against-

ALIMENTATION COUCHE-TARD INC., ACT
ACQUISITION SUB, INC.,

                                Defendants.

**Civil Action No.  4:10-cv-265**

**COMPLAINT**

**ECF CASE**

## <u>COMPLAINT</u>

Plaintiff Casey's General Stores, Inc. ("Casey's" or "the Company"), by and through its undersigned attorneys, brings this Complaint against Defendants Alimentation Couche-Tard Inc. and ACT Acquisition Sub., Inc. (together, "Couche-Tard") pursuant to Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5 and 14e-8 promulgated thereunder.

Casey's alleges the following upon knowledge as to its own acts and upon information and belief as to all other matters.  Casey's allegations are based in part on the investigation of Casey's attorneys, which included, among other things, a review and analysis of (i) United States Securities Exchange Commission ("SEC") filings; (ii) press releases, news articles and other public statements issued by or concerning Couche-Tard; and (iii) research and analyst reports concerning Couche-Tard and its business strategies.  Based on the substantial evidence already developed, Casey's believes that a reasonable opportunity for discovery will uncover further substantial evidentiary support for the allegations contained herein.  Certain of the facts

supporting the allegations contained herein are known only to Couche-Tard or are exclusively within its custody or control.

## NATURE OF THE ACTION

1.    This case involves an egregious market manipulation scheme perpetrated by Couche-Tard in an attempt to acquire Casey's at an artificially deflated price.  By announcing its intent to acquire Casey's in a hostile takeover – and then immediately selling nearly two million shares of Casey's stock on the open market – Couche-Tard simultaneously:  (1) reaped millions of dollars of profit in a classic "pump and dump" scheme; and (2) artificially depressed the run up in Casey's stock price that otherwise would have followed the announcement of Couche-Tard's takeover bid, thereby making Couche-Tard's low ball tender offer appear more viable than it actually is.   Couche-Tard should be enjoined from capitalizing any further on its misdeeds.

2.    Couche-Tard is the second largest independent convenience store operator in North America.  Couche-Tard opened in 1980 and is headquartered in Laval, Quebec, Canada.  Couche-Tard operates nearly 5,900 stores in Canada and the United States.

3.    Throughout its history, Couche-Tard has grown its business by acquiring other convenience store operators and, within the last ten years, has dramatically expanded its presence in the United States by acquiring a number of convenience store companies headquartered here.

4.    Couche-Tard has publicly stated its intent to expand its business through additional major acquisitions.  In fact, Couche-Tard has told its shareholders that it expects to double the number of stores it operates within the next several years.

5.    Despite that lofty promise, Couche-Tard has been unable to close a major acquisition (i.e., an acquisition involving more than 1,000 stores) since it acquired Circle K and

its over 1,600 stores in 2003.  Equity research analysts and the investing public have taken notice.  Many investors have begun to question whether Couche-Tard can execute on its aggressive expansion plans.  Faced with the pressure to make a "game changing" acquisition as soon as possible, Couche-Tard set its sights on Casey's in Fall 2009.

6.      Casey's was founded in Iowa in 1967.  From its roots as a single store in Des Moines, it has grown to 1,513 stores located in nine Midwestern states, primarily Iowa, Illinois and Missouri.  Casey's has consistently outperformed its peers, posting same-store sales growth for 25 consecutive quarters.  During the three year period ending April 8, 2010, Casey's stock increased 24%, compared to an average <u>decrease</u> of 46% for its convenience store peer group and a decrease of 18% for the S&P 500.  In short, Casey's has tremendous current and long-term value that rightly belongs to its shareholders.

7.      In late 2009, Couche-Tard – facing pressure from investors and Wall Street analysts – set out to capture Casey's tremendous value at a bargain basement price.  Couche-Tard knew that it would be commercially impractical (and perhaps impossible) for it to purchase all of Casey's stock at a share price that represents Casey's true value.  Instead, to satisfy its investors' appetite for a large acquisition that would immediately enhance Couche-Tard's earnings, Couche-Tard knew it would have to purchase Casey's stock at an artificially deflated price.

8.      To that end, in September 2009, Couche-Tard quietly began acquiring Casey's stock on the open market.  By October 5, 2009, it had purchased over 140,000 Casey's shares – without even having broached the topic of a strategic transaction with Casey's.

9.      On October 6, 2009, Couche-Tard's President and Chief Executive Officer, Alain Bouchard, asked Casey's President and Chief Executive Officer, Robert J. Myers, whether

3

Casey's would consider a strategic alliance with Couche-Tard. Mr. Myers responded that Casey's was excited about its own strategic plans and was not interested in such an alliance. Mr. Myers rejected a similar overture from Couche-Tard in November 2009, and asked Couche-Tard to make any further offers in writing.

10.    On March 9, 2010, Couche-Tard wrote to Casey's Board of Directors (the "Board") and offered the Company $36 per share for all outstanding shares of Casey's stock. Because the offer severely undervalued Casey's, and would not have been in the best interest of the Company or its constituencies, the Board rejected Couche-Tard's offer on March 29, 2010. Couche-Tard made an identical offer to Casey's Board on March 30, 2010, which Casey's Board again rejected, on April 7, 2010.

11.    In the meantime, Couche-Tard continued quietly amassing Casey's shares. Couche-Tard made over 40 discreet purchases of Casey's stock from September 2009 to April 2010, and continued to buy Casey's shares as late as April 7 and 8, 2010, buying over 39,000 and 13,000 shares on those two days, respectively.

12.    By April 8, 2010, Couche-Tard had acquired nearly two million Casey's shares. Couche-Tard acquired those shares at prices ranging from around $29 to $33 per share. Couche-Tard's 1.98 million shares represented a 3.9% ownership interest in Casey's – approaching the maximum level of ownership that would still allow Couche-Tard to keep its ownership interests confidential.

13.    Casey's shares, which are traded on the NASDAQ Stock Market (the "NASDAQ"), closed at $31.59 on April 8, 2010.

14.    Before the market opened on April 9, 2010, Couche-Tard publicly announced that it had "submitted a proposal to the Board of Directors of Casey's General Stores . . . to acquire

4

all of the outstanding shares of common stock of Casey's for $36.00 per share in cash". (4/9/10 Couche-Tard Press Release.) Couche-Tard also announced that "if [Casey's Board] continue[s] to refuse to engage in meaningful negotiations, we are prepared to submit our proposal directly to [Casey's] shareholders [i.e., to commence a tender offer] and commence a proxy contest to replace [Casey's] Board of Directors". (Id.) Couche-Tard filed its press release under Schedule TO-C.

15.    Couche-Tard's press release did not disclose that it owned two million shares of Casey's stock, much less that Couche-Tard had any plan to sell those shares.

16.    In immediate response to Couche-Tard's takeover announcement, and as Couche-Tard had intended, Casey's stock price opened much higher on April 9 than it closed on April 8. Indeed, Casey's stock price jumped to $38.13 per share at the opening on April 9, a 21% increase over the prior day's closing price.

17.    Immediately after the opening, and without making any additional disclosure, Couche-Tard dumped essentially all of its Casey's stock into the market – 1,975,000 shares in total – at $38.43 per share. Couche-Tard netted well over $10 million dollars in profit from that sale. Nearly two months later, Couche-Tard revealed – for the first time – in SEC filings that it had sold its Casey's stock on April 9, 2010 "in **an** open market sale" "at **a** price of $38.43 per Share". (Couche-Tard Schedule TO at 31.) The trading data indicate that this sale must have happened within the first hour of the April 9 opening.

18.    In other words, Couche-Tard sold nearly two million shares of Casey's stock – at a profit of more than $10 million – immediately after announcing its intent to launch a hostile takeover of Casey's. Couche-Tard did not even mention its ownership of Casey's stock – let alone its plan to dump all of that stock – in the press release it issued just hours before it made its

massive sale.  Indeed, for almost two months after it announced its intention to launch its hostile bid for Casey's and simultaneously dumped its two million shares of Casey's stock into the market, Couche-Tard kept secret both that it had owned those shares and that it had sold nearly all of them.

19.    The egregious nature of Couche-Tard's conduct should speak for itself.  It is a classic "pump and dump" scheme – Couche-Tard announced a hostile tender offer and, when the tender offer had its planned effect of increasing the stock price (the pump), Couche-Tard sold virtually all of its shares at a lavish profit (the dump).  Had Couche-Tard informed the market that it planned to sell nearly two million shares of Casey's stock immediately after the opening, Casey's stock would not have jumped as much as it did in response to Couche-Tard's takeover bid.  Adequate disclosure would have cost Couche-Tard millions of dollars.  Inadequate disclosure manipulated Casey's share price to Couche-Tard's advantage.

20.    But that was only the first aspect of Couche-Tard's market manipulation scheme. Couche-Tard also benefited by announcing its $36 tender offer – a low ball offer that it knows has no chance of succeeding under non-manipulated market conditions – immediately before dumping its stock.  In essence, the low ball offer and massive sale prevented Casey's stock from gaining as much as it would have under normal, efficient market conditions, i.e., Couche-Tard's massive sale artificially depressed Casey's post-Announcement stock price.  That artificial depression has caused Couche-Tard's current $36 per share offer – made on June 2, 2010 – to appear more viable than it actually is.

21.    Couche-Tard could have allowed the stock price to reach its peak before dumping its stock, which would have allowed it to reap more profits.  Instead, Couche-Tard played it both

6

ways:  it took some immediate profit, but made a massive sale to prevent the stock from reaching its natural (and higher) price.

22.   While sophisticated investors and analysts immediately recognized that Couche-Tard's $36 per share offer is hopelessly low, Couche-Tard prevented the market price from fully reflecting that information by selling into its own offer, thereby putting its thumb on the scale and preventing the market from functioning normally (or efficiently).  Absent Couche-Tard's manipulative acts, Casey's stock price would have gone much higher, and would have reflected the true value of Casey's shares – a price substantially over $40 a share.  Casey's stock closed on Thursday, June 10, at $35.71 per share.

23.   Couche-Tard's plan allowed it to have its cake and eat it too.  On the one hand, it took advantage of the jump in share price by selling a massive block of shares for a massive profit.  It also hedged against the risk that Casey's stock price would drop when its inadequate takeover bid fails – it now has nothing to lose because it has liquidated its position in Casey's.  On the other hand, that same massive sale prevented Casey's share price from reaching its true value, which would have doomed Couche-Tard's attempt to acquire Casey's with its low ball tender offer, and would have revealed even more dramatically how inadequate its offer price is.

24.   A Wall Street Journal reporter described the situation aptly:  "The question is whether Couche-Tard should be allowed to get a free hedge at the expense of other investors. . . . When acquirers can exploit deal mania with such precision, investors are probably right to step back."  (John Jannarone, Alimentation's Marriage of Convenience, Wall Street Journal, C16, June 9, 2010.)

## THE PARTIES

### A.    The Plaintiff.

25.    Plaintiff Casey's is a corporation duly organized under the laws of the State of Iowa, with its principal place of business at One Convenience Boulevard, Ankeny, Iowa, 50021. Casey's operates convenience stores in the Midwest, which carry a broad selection of food and nonfood items.  Casey's common stock is traded on the NASDAQ under the symbol "CASY".

### B.    The Defendants.

26.    Defendant Alimentation Couche-Tard Inc. is a corporation incorporated under the laws of Canada, with its principal administrative offices at 4204 Industriel Boulevard, Laval, Quebec, Canada H7L OE3.   Couche-Tard operates convenience stores throughout North America.  Couche-Tard has over 3,500 stores in the United States, primarily operated under its Circle K banner, which are spread across 43 states, including Iowa, and the District of Columbia. Couche-Tard's common stock is traded on the Toronto Stock Exchange under the symbols ATD.A and ATD.B.    Couche-Tard is a Canadian foreign private issuer subject to the informational requirements of the Exchange Act and, in accordance therewith, files reports and other information with the SEC concerning its business, financial condition and other matters.

27.    Defendant ACT Acquisition Sub, Inc. ("ACT") is an indirect wholly owned subsidiary of Alimentation Couche-Tard Inc., formed by Alimentation Couche-Tard Inc. in 2010 solely in order to make the tender offer that is the subject of this action and to take other action in connection therewith.  ACT is incorporated under the laws of the State of Iowa.

## JURISDICTION AND VENUE

28.     This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

29.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) and (c) and 15 U.S.C. § 78aa.

30.     Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201 because an actual controversy exists regarding the proprietary of Couche-Tard's April 9, 2010 Announcement of its planned tender offer and sale of Casey's shares under Sections 10(b) and 14(e) of the Exchange Act and Rules 10b-5 and 14e-8 promulgated thereunder

31.     In connection with the acts alleged in this complaint, Couche-Tard, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ and other national securities exchanges.

## FACTUAL BACKGROUND

### A.     Couche-Tard Publicly Commits To Massive Expansion of Its Operations.

32.     Over the last several years, Couche-Tard has promised its investors that it will increase shareholder value by undertaking a massive expansion, fueled in large part by acquisitions.  As reported in the press on April 9, 2010, "Mr. Bouchard [Couche-Tard's President and CEO] and other senior executives had been telling analysts and media for years that they were actively looking for another major deal similar in size to the Circle-K transaction. . . . . There have been several modest acquisitions by Couche-Tard since Circle-K, but nothing close to the magnitude of the proposed Casey's deal."  (Bertrand Marotte, Couche-Tard's big U.S. bid

rejected; Convenience store operator's $1.9 billion (U.S.) offer for Casey's General Stores

dismissed as too low, The Globe and Mail, April 9, 2010.)

33.    Couche-Tard's corporate strategy depends upon Couche-Tard doubling in size

over the next several years.  Investors and the press are well aware of this aggressive expansion

strategy:

> "Mr. Bouchard recently reaffirmed the corporate strategy of doubling the existing
> 5,883 stores within the next several years." (Id.)

> "Couche-Tard, which has grown steadily through acquisitions over the years, has
> made no secret that it is on the prowl for more deals in the United States.  It told
> analysts that it was looking for another big buy similar to its $804 million
> purchase of the Circle K chain, which it closed in 2003."  (Scott Anderson,
> Casey's rejects Couche-Tard's $1.85 billion bid, Reuters, April 9, 2010.)

34.    Couche-Tard has gone to the market with its plan of acquiring a large company

and, eventually, doubling the size of its operations.  Investors have paid close attention to

whether Couche-Tard will be able to execute this strategy:

> "For years, investors in Alimentation Couche-Tard Inc. . . . speculated about
> when chief executive officer Alain Bouchard would score another blockbuster
> deal after the 2003 acquisition of the Circle K convenience-store chain in the
> U.S."  (Bertrand Marotte, Couche-Tard makes fresh push into U.S.; Quebec-based
> convenience store giant launches hostile, $1.9-billion (U.S.) bid for Midwest
> chain, The Globe and Mail, April 9, 2010, at B3.)

35.    A failure to execute its strategy would not only cost management significant

credibility in the market, it also would severely hamper Couche-Tard's stock price.  Indeed,

several industry commentators have questioned whether Couche-Tard can execute a successful

business plan without closing a large acquisition.

> "[A]nalysts said it's unlikely the stock will do much until Couche-Tard can bag
> another major acquisition on the level of its 2003 purchase of the U.S.-based
> Circle K chain. 'We like the stock long-term,' said one analyst who asked not to
> be identified. 'But it could become a 'ho-hum' story for the next while. In the
> absence of acquisitions, we believe the growth will slow significantly.'"  (Sean
> Silcoff, COUCHE-TARD INVESTORS EAGER FOR NEXT BUY; Q4 Profit

Up; Acquisition Needed To Boost Stock Out Of 'Ho-Hum Story': Analysts, Financial Post, July 18, 2007, at FP5.)

"Growth by acquisition in this low growth / fragmented industry continues to be integral to the company's long-term approach to value creation, and on yesterday's webcast [Couche-Tard's] CEO Alain Bouchard reiterated that the Company is actively looking for acquisition opportunities. However, given that we cannot model acquisitions that have yet to be made, our financial forecasts reflect only current operations." (Re-Setting the Pump: Q3 Results Reflect Gas Prices, Weak Economy, RBC Capital Markets, March 10, 2010.)

36.    Couche-Tard's management was under extreme pressure in late 2009 and early 2010 to make a game changing acquisition in the near term.  It had fallen behind its own strategic plan:  "Couche-Tard, which has been aggressive in its acquisitions south of the [Canadian] border . . . had put the brake on its M&A activity during the recession."  (Dean Best, Long Road ahead for Couche-Tard in Casey's pursuit, Just Food, April 13, 2010.)

**B.    Couche-Tard Accumulated Nearly Two Million Shares of Casey's Stock on the Open Market.**

37.    Recognizing that it had to pull out all the stops to acquire a large company as soon as possible, Couche-Tard turned its focus to Casey's in Fall 2009.

38.    Starting in September 2009, Couche-Tard methodically – and invisibly – set about acquiring a substantial equity interest in Casey's.   According to Couche-Tard's Notice of Nomination delivered to Casey's, it acquired 1,975,326 shares of Casey's stock between September 2009 and April 8, 2010, by making the following purchases on the following dates:

| Purchase or Sale of Shares by Couche-Tard in Past Two Years ||
|---|---|
| **Date of Purchase or Sale** | **Amount Purchased or (Sold)** |
| 09/24/2009 | 102,800 |
| 09/25/2009 | 17,200 |
| 10/02/2009 | 400 |
| 10/05/2009 | 21,400 |
| 10/14/2009 | 300 |
| 10/16/2009 | 30,400 |
| 10/19/2009 | 6,900 |
| 10/20/2009 | 51,005 |
| 10/21/2009 | 170,500 |
| 10/22/2009 | 9,107 |
| 10/23/2009 | 37,600 |
| 10/26/2009 | 13,700 |
| 10/27/2009 | 23,900 |
| 10/28/2009 | 42,700 |
| 10/29/2009 | 67,700 |
| 10/30/2009 | 122,800 |
| 11/02/2009 | 114,200 |
| 11/03/2009 | 85,800 |
| 11/04/2009 | 29,700 |
| 11/05/2009 | 31,800 |
| 11/06/2009 | 68,838 |
| 11/10/2009 | 9,600 |
| 11/11/2009 | 59,100 |
| 11/12/2009 | 90,400 |
| 11/13/2009 | 119,500 |
| 11/30/2009 | 69,900 |
| 12/01/2009 | 8,200 |
| 12/03/2009 | 73,800 |
| 12/04/2009 | 3,900 |
| 12/08/2009 | 139,400 |
| 12/09/2009 | 13,200 |
| 12/17/2009 | 33,126 |
| 12/18/2009 | 36,705 |
| 03/24/2010 | 24,442 |

| | |
|---|---|
| 03/25/2010 | 40,542 |
| 03/26/2010 | 28,800 |
| 03/29/2010 | 45,666 |
| 03/30/2010 | 32,212 |
| 03/31/2010 | 28,023 |
| 04/01/2010 | 17,002 |
| 04/05/2010 | 100 |
| 04/07/2010 | 39,894 |
| 04/08/2010 | 13,100 |

39.    Couche-Tard purchased those Casey's shares at prices ranging from around $29 to $33 per share.

40.    Couche-Tard was careful to keep its total purchases of Casey's stock at the maximum level at which it could still maintain the secrecy of its holdings (and the secrecy of its plan).

**C.    Couche-Tard Makes Casey's A Low Ball Offer, Which Casey's Repeatedly Rejects.**

41.    On October 6, 2009, Mr. Robert J. Myers, President and Chief Executive Officer of Casey's, had a telephone conversation with Mr. Alain Bouchard, President and Chief Executive Officer of Couche-Tard, that was intended to be a discussion regarding how credit card interchange fees are impacting the convenience store industry.  During that call, Mr. Bouchard asked Mr. Myers if Casey's would consider a strategic alliance with Couche-Tard. Mr. Myers said that the Company was excited about its strategic plan and was not interested in such an alliance.

42.    On November 6, 2009, Mr. Myers and Mr. Bouchard had a telephone conversation during which Mr. Bouchard suggested that a strategic alliance between Casey's and Couche-Tard would be beneficial for both companies.  Mr. Myers informed Mr. Bouchard that

the Company was not interested in such an alliance, and advised Mr. Bouchard to put any offer in writing for submission to the Board for consideration.

43.    On March 9, 2010, Mr. Myers received a letter from Mr. Bouchard.  The letter contained a non-binding proposal to acquire 100% of the outstanding Casey's Common Shares at a price of $36.00 per share in cash.  The text of the letter is set forth below:

"March 9th, 2010

Robert J. Myers

Casey's General Stores, Inc. One S.E. Convenience Blvd. Ankeny, Iowa 50021

Mr. Myers:

Pursuant to our discussion and your request that I put any proposal in writing, Alimentation Couche-Tard Inc. ("Couche-Tard') is pleased to set forth the following proposal to acquire 100% of the outstanding shares of Casey's General Stores, Inc. ("Casey's").

Based on our review of publicly available information regarding Casey's, our Board of Directors has authorized a proposal to acquire Casey's at a price of $36.00 per share in cash to your shareholders. This represents a 17.0% premium over Casey's closing price on March 1st, 2010 ($30.76), a 20.1% premium over Casey's 30-calendar day average closing price, and a 10.3% premium over Casey's all-time high closing share price of $32.65. The transaction consideration implies a LTM January 31st, 2010 EBITDA multiple of 7.4x and EV/store multiple of $1.2 million per store, which compares favorably to multiples of publicly traded companies and precedent transactions in our industry. We believe this proposal is compelling for Casey's and its shareholders, and provides a unique opportunity for Casey's shareholders to realize full and immediate value.

We have retained Credit Suisse as our financial advisor and Dewey & LeBoeuf LLP as our legal counsel. Our senior management team, our legal counsel, and Credit Suisse are available at your convenience to discuss any aspect of the terms and structure of our proposed transaction.

Couche-Tard is the leader in the Canadian convenience store industry and the largest independent convenience store operator (whether integrated with a petroleum company or not) in North America in terms of number of company-operated stores. As of March 1st. 2010, we had a market value of $3.5 billion. In our history, we have successfully completed numerous transactions, including the acquisition of Circle K from ConocoPhillips and deals with ExxonMobil, Shell, BP and Spirit Energy.

We have an extremely high regard for your operations, management and employees. Our operations are highly decentralized, and we have a track record of keeping most of the existing management and employees in place as we did in the Circle K transaction.

Given our financial strength and the strong support of our financing source, Credit Suisse, we do not anticipate that financing for the proposed acquisition will be an issue.

It is our current intention to keep the contents of this letter private. This proposal is nonbinding, and Couche-Tard shall have no obligations other than those set forth in a definitive agreement. We are prepared to proceed expeditiously and believe we can be in position to execute a definitive agreement within two to three weeks.

We are excited about a possible combination and plan to contact you in the near future to discuss our proposal. In the meantime, please do not hesitate to contact me or our advisor Greg Weinberger at Credit Suisse (212-325-0452) with any questions.

Sincerely,

/s/ Alain Bouchard

Alain Bouchard

President and Chief Executive Officer"

44.    That same day, Mr. Myers notified the Board and other members of senior management of Couche-Tard's unsolicited proposal.

45.    On March 10, 2010, after meeting with the Executive Committee of the Board to discuss Couche-Tard's proposal, Mr. Myers sent an email to Mr. Bouchard acknowledging receipt of Couche-Tard's proposal.

46.    On March 23, 2010, at a regularly scheduled meeting of the Board in Ankeny, Iowa, and again on March 25, 2010, at a meeting of the Board held by teleconference, the Board met with members of senior management, as well as the Company's legal advisors, and Goldman, Sachs & Co., the Company's financial advisor. The Board carefully considered the strategic, financial and legal aspects of Couche-Tard's proposal and the nature and timing of the

proposal. On March 25, 2010, at a meeting of the Board held by teleconference, the Board unanimously determined that Couche-Tard's proposal was not in the best interests of the Company and unanimously determined to reject such proposal.

47.    On March 29, 2010, Mr. Myers sent the following letter to Mr. Bouchard:

"March 29, 2010

Mr. Alain Bouchard

President & Chief Executive Officer Alimentation Couche-Tard Inc. 1600, St-Martin Blvd. East

Tower B, Suite 200

Laval (Quebec) H7G 4S7

Dear Mr. Bouchard:

We received your letter dated March 9, 2010 outlining your unsolicited proposal to acquire Casey's General Stores, Inc. Our Board of Directors has thoroughly evaluated it in consultation with our financial and legal advisors, and has unanimously rejected your proposal.

We recognize your high regard for our operations, management and employees. We agree with your observation that we have built a great brand at Casey's, and we are very excited about the opportunities to continue to grow our business.

Sincerely,

/s/ Robert J. Myers

Robert J. Myers

President & Chief Executive Officer"

48.    On March 30, 2010, Mr. Myers received the following letter from Mr. Bouchard:

"March 30, 2010

Robert J. Myers

President and Chief Executive Officer Casey's General Stores, Inc.

One Convenience Blvd.

Ankeny, Iowa 50021

Mr. Myers:

As conveyed to you in our letter dated March 9, 2010, our Board of Directors has authorized a proposal to acquire all of the outstanding shares of common stock of Casey's General Stores, Inc. ("Casey's") at a price of $36.00 per share in cash. We had sent you that letter in response to your request that we put our proposal in writing. We are in receipt of your letter dated March 29, 2010, in which you informed us that your Board of Directors has unanimously rejected our proposal. We are disappointed with your response.

As previously stated, our Board of Directors and management believe that a combination of Alimentation Couche-Tard Inc. ("Couche-Tard") and Casey's presents an exciting opportunity to create significant value for our respective shareholders. Our proposal represents a 17.0% premium over Casey's closing price on March 1, 2010 of $30.76, a 20.1% premium over Casey's 30-calendar day average closing price, and a 10.3% premium over Casey's all-time high closing price of $32.65. The transaction consideration implies a LTM January 31, 2010 EBITDA multiple of 7.4x and EV/store multiple of $1.2 million per store, which compares favorably to multiples of publicly traded companies and precedent transactions in our industry.

As stated in our March 9 letter, Couche-Tard is the leader in the Canadian convenience store industry and the largest independent convenience store operator (whether integrated with a petroleum company or not) in North America in terms of number of company-operated stores. As of March 1, 2010, we had a market value of $3.5 billion. In our history, we have successfully completed numerous transactions, including the acquisition of Circle K from ConocoPhillips and deals with ExxonMobil, Shell, BP and Spirit Energy.

We have an extremely high regard for your operations, management and employees. Our operations are highly decentralized, and we have a track record of keeping most of the existing management and employees in place as we did in the Circle K acquisition.

As previously mentioned, we have retained Credit Suisse as our financial advisor and Dewey & LeBoeuf LLP as our legal counsel. Our senior management team and our legal and financial advisors remain ready to meet with you and your representatives at your earliest convenience to discuss our proposal in detail and to negotiate definitive transaction documents. We continue to prefer to work together with you and your Board of Directors to negotiate a transaction for presentation to your shareholders as the joint effort of Casey's and Couche-Tard. We are prepared to proceed expeditiously and believe we can be in position to execute a definitive agreement within 2 to 3 weeks with your cooperation.

Given our financial strength and the strong support of our financing source, Credit Suisse, we do not anticipate that financing for the proposed transaction will be an issue.

17

I want to emphasize to you and your Board of Directors our seriousness about this proposal and our commitment to a combination of Couche-Tard and Casey's. We are convinced that this proposal is compelling for Casey's and its shareholders and provides a unique opportunity for Casey's shareholders to realize full and immediate value. We also firmly believe that, given our approach to acquisitions, this transaction would be in the best interests of your employees, customers and the communities in which you operate. We believe that your failure to engage us in discussions about our proposal is not in the best interest of your shareholders or any of your other constituencies.

At this point, we intend to keep this letter and its contents private. However, if you continue to be unwilling to engage in meaningful negotiations with us, we will have no choice other than to make your shareholders aware of our proposal.

We trust that you and your Board of Directors will give this proposal serious consideration. We would appreciate your prompt reply to our proposal, and no later than 12:00 noon, New York City time, on April 7, 2010.

We look forward to a timely and favorable response. Sincerely,

/s/ Alain Bouchard

Alain Bouchard

President and Chief Executive Officer"

49.    On April 5, 2010, at a meeting of the Board held by teleconference, the Board met with members of senior management and representatives of its legal and financial advisors. During this meeting, the participants discussed the March 30th letter from Mr. Bouchard.

50.    On April 7, 2010, Mr. Myers sent the following letter to Mr. Bouchard:

"April 7, 2010

Mr. Alain Bouchard

President & Chief Executive Officer Alimentation Couche-Tard Inc. 1600, St-Martin Blvd. East

Tower B, Suite 200

Laval (Quebec) H7G 4S7

Dear Mr. Bouchard:

We received your letter dated March 30, 2010 regarding your unsolicited proposal to acquire Casey's General Stores, Inc. As I stated in my previous letter, the Board has unanimously determined to reject your proposal. I assure you that the Board takes its fiduciary duties very seriously and came to this conclusion after a thorough, thoughtful evaluation of the proposal in consultation with our advisors, Goldman, Sachs & Co. and Cravath, Swaine & Moore LLP. The Board firmly believes that the proposal is not in the best interests of the Company.

We remain very excited about the opportunities to continue to grow our business and build on our strong proven track record of success.

Sincerely,

/s/ Robert J. Myers

Robert J. Myers

President & Chief Executive Officer"

**D.   It Would Be Detrimental to Couche-Tard To Pay Full Value for Casey's Shares.**

51.   Couche-Tard's low ball offer is easily explained.  As analysts, commentators and rating agencies have stated since Couche-Tard's takeover bid became public, Couche-Tard simply does not have the financial wherewithal to complete a tender offer at a price representative of Casey's true value.

52.   Among other things, Couche-Tard does not have the cash or credit on hand to acquire Casey's shares even at the current $1.9 billion total price.

"Alimentation Couche-Tard would have to find at least $2 billion to acquire Casey's, especially since the Quebec giant wants to pay cash."  (Carl Renaud, Casey's rejects Couche-Tard offer, Sarnia Observer, April 10, 2010.)

"Couche-Tard has more than $600-million of cash and existing credit available, and is clearly hoping that the credit market improves between now and the time it must write a cheque to shareholders at Casey's."  (Andrew Willis, Bad Timing for Couche-Tard's hostile bid, The Globe and Mail, June 4, 2010, at B12.)

53.   At any higher price, Couche-Tard might have to issue substantial amounts of new equity just to fund the deal, which would undermine the benefits of an acquisition.

"According to [Desjardins Securities Analyst Martin] Landry, if Couche-Tard has to raise its offer, and given its already high leverage, there is a likelihood the firm will need to issue more stock. That could dampen the potential value that would accrue to shareholders." (Peter Hadekel, Will Couche-Tard raise its bid?; First offer for Casey's is rejected, The Gazette, April 14, 2010, at B1.)

54.    Couche-Tard's rating agency has confirmed Couche-Tard's dilemma even at the current low ball price.

"Alimentation Couche-Tard Inc.'s credit rating has been placed under review by Moody's Investor Services [sic] after the convenience store's hostile bid for Casey's General Stores Inc. 'The review for downgrade considers Moody's belief that Casey's would represent a relatively large sized acquisition which has the potential to increase ACT's initial adjusted pro-forma leverage from roughly 3x to over 4x,' the credit rating agency said on Monday. . . . The Moody's review will focus on Couche Tard's plans to finance the potential transaction, including an assessment of its resulting balance sheet, liquidity profile and plans for future debt reduction. The Quebec convenience store's rating would likely be downgraded if Moody's concluded that the company's adjusted debt/EBITDA moved towards 4x, with cash flow relative to adjusted debt levels in the 'low single digits.'" (David Pett, Moody's Puts Couche-Tard Under Review for Downgrade on News of Casey's Bid, Financial Post, April 14, 2010.)

"One potential hiccup: the already indebted Couche-Tard has been placed under review for downgrade by Moody's Investor Service because its debt ratio would jump significantly in order to finance the purchase." (Peter Hadekel, Will Couche-Tard raise its bid?; First offer for Casey's is rejected, The Gazette, April 14, 2010, at B1.)

"It was not clear late last week whether Couche-Tard would raise its offer, however, especially after debt rating service Moody's said it would review the company for a downgrade given estimates of its debt ratio following the proposed acquisition." (Jon Springer, Casey's Rejects Buyout Offer, Supermarket News, April 19, 2010, at 8.)

55.    Couche-Tard is limited in what it can afford to pay. Yet, its investors are demanding an immediate, large scale acquisition. These factors explain the motivation behind Couche-Tard's scheme to manipulate Casey's stock price down to an affordable level.

56.    Indeed, even at the low ball price of $36 per share, there is significant risk that Couche-Tard will not be able to complete the acquisition. Two months into their "offer", Couche-Tard still has no committed financing. Couche-Tard has merely indicated that it plans on

obtaining the necessary funds from a combination of cash on hand, borrowings under existing credit facilities and new financings that it will seek to obtain. Couche-Tard has stated that it currently has only $138.3 million of cash on hand and $501.5 million available under existing credit agreements. Assuming none of this cash or credit agreement capacity is required to run the Couche-Tard business, that still leaves approximately $1.3 billion (or 68%) of Couche-Tard's estimated $1.9 billion of financing needs in question. If adequate financing is not arranged, Couche-Tard will not be able to pay even the patently inadequate offer price.

57.    Couche-Tard has explicitly acknowledged that the risk associated with this financing condition is significant as it has stated in its offer to purchase, "We cannot guarantee that Alimentation Couche-Tard will be able to obtain financings necessary to satisfy the financing condition to the consummation of the offer, particularly in light of the current economic conditions in the U.S. and Canada." (Couche-Tard Schedule TO, Summary Term Sheet at iv.)

58.    Put simply, Couche-Tard realized that for its tender offer to have any chance of success, it had to artificially deflate Casey's stock price after it made its tender offer announcement.

E.    **Couche-Tard Artificially Depresses the Value of Casey's Stock By Dumping Nearly Two Million Casey's Shares Into the Market Immediately After Announcing Its Intent to Make Its Low Ball Tender Offer to Casey's Shareholders.**

59.    Couche-Tard's scheme for deflating the stock price was deceptively simple.

60.    On April 9, 2010, before the market opened, Mr. Bouchard sent the following letter to the Board, and Couche-Tard issued a press release that included the letter and described the terms of the Couche-Tard proposal ("the Announcement"):

"April 9, 2010

21

The Board of Directors of Casey's General Stores, Inc.

c/o Robert J. Myers

Casey's General Stores, Inc.

One Convenience Blvd.

Ankeny, Iowa 50021

Mr. Myers:

As conveyed to you in our letters dated March 9, 2010 and March 30, 2010, our Board of Directors has authorized a proposal to acquire all of the outstanding shares of common stock of Casey's General Stores, Inc. ("Casey's") at a price of $36.00 per share in cash. Despite our repeated efforts starting in October 2009 to engage in negotiations, and without the benefit of discussing our proposal with us or our advisors, your Board of Directors unanimously rejected our proposal. Our goal remains to work with you to agree to a negotiated transaction. However, due to your unwillingness to engage in discussions and the unique opportunity presented by our proposal for your shareholders to realize full and immediate value, we are compelled to make this proposal known to your shareholders.

As we have stated in our prior correspondence, including our initial contact in October 2009, we believe that a combination of Casey's and Alimentation Couche-Tard Inc. ("Couche-Tard') presents an exciting opportunity to create significant value for our respective shareholders, employees, business partners and other constituencies. The transaction consideration implies a last twelve months (as of January 31, 2010) EBITDA multiple of 7.4x and a price of $1.3 million per store, which compares favorably to corresponding metrics of publicly traded companies and precedent transactions in our industry. Our proposal represents a 14% premium over Casey's closing price on April 8, 2010, a 17% premium over Casey's 90-calendar day average closing price and a 24% premium over Casey's one-year average closing price.

Couche-Tard is the largest independent convenience store operator in North America (whether integrated with a petroleum company or not) in terms of number of company-operated stores. As of April 8, 2010, we had an enterprise value of $4.1 billion. As you know, we have successfully completed similar transactions, including the acquisition of Circle K from ConocoPhillips and transactions with ExxonMobil, Shell, BP and Spirit Energy. As such, we are confident that we can successfully combine our two companies to quickly maximize the benefits for our respective constituencies.

We have an extremely high regard for your operations, management and talented employees. Our operations are highly decentralized and we have a track record of keeping most of the existing management and employees in place as we did in the Circle K acquisition and our other transactions.

Our senior management team and our legal and financial advisors have already completed extensive analysis and due diligence of Casey's based on publicly available information. As previously mentioned, we have retained Credit Suisse Securities (USA) LLC as our financial advisor and Dewey & LeBoeuf LLP as our legal counsel. We have also retained Innisfree M&A Incorporated as our proxy solicitor. We are prepared to proceed expeditiously and, with your cooperation, believe we can be in position to execute a definitive agreement within two to three weeks.

Given our financial strength and the strong support of our financing sources, we do not anticipate that financing for the proposed transaction will be an issue.

I want to emphasize to you and your Board of Directors our seriousness about this proposal and our commitment to a combination of Casey's and Couche-Tard. We are convinced that this proposal is compelling for Casey's and its shareholders and provides a unique opportunity for Casey's shareholders to realize full and immediate value. We also firmly believe that, given our approach to acquisitions, this transaction would be in the best interests of your employees, customers and the communities in which you operate. We believe that your continued failure to engage in discussions about our proposal is not in the best interest of your shareholders or any of your other constituencies.

Our strong preference is to work with you to negotiate a mutually acceptable transaction and avoid unnecessary costs. Our senior management team and our legal and financial advisors remain ready to meet with you and your representatives at your earliest convenience to discuss our proposal in detail. However, if you continue to refuse to engage in meaningful negotiations, we are prepared to submit our proposal directly to your shareholders and commence a proxy contest to replace your Board of Directors.

We urge you and your Board of Directors to reconsider our proposal. We look forward to a timely and favorable response. Sincerely,

/s/ Alain Bouchard

Alain Bouchard

President and Chief Executive Officer"

61.    The Announcement was intended to – and did – manipulate the price of Casey's stock. It caused the stock price to jump, immediately upon the market opening on April 9, 2010, from just over $31 per share to over $38 per share.

62.    Immediately after the Announcement, Couche-Tard dumped virtually all of its shares into the market at $38.43 per share. Couche-Tard's own public disclosures make clear

that "[o]n April 9, 2010, Couche-Tard sold 1,975,000 Shares at a price of $38.43 per Share in an open market sale".  (Couche-Tard Schedule TO at 31.)

63.    The intra-day trading history shows that Couche-Tard must have dumped its Casey's stock during the first hour of trading.  That was the only time during the day in which a two million share chunk could have traded, and the only time the shares could have traded in the market at Couche-Tard's $38.43 price:

GRAB                                                             EquityGIT

11:35           INTRA-DAY  PRICE  INTERVALS    Page 1 /2
CASEY'S GENERAL STORES I (CASY    US)      PRICE 35.85      P    $    DELAYED
Date    4/ 9                       Interval Size (Minutes)      15       USD

| Time Interval | Close | NetChg | Open | High | Low | Tick | Volume |
|---|---|---|---|---|---|---|---|
| | 39.10 | + 7.51 | 38.13 | 39.37 | 37.90 | 34825 | 11584213 |
| | | | | | | | |
| 09:30 - 09:45 | 38.75 | + 7.16 | 38.13 | 38.99 | 37.90 | 7765 | 2808443 |
| 09:45 - 10:00 | 38.41 | - .34 | 38.78 | 38.85 | 38.34 | 4543 | 1322535 |
| 10:00 - 10:15 | 38.57 | + .16 | 38.40 | 38.59 | 38.39 | 2149 | 824123 |
| 10:15 - 10:30 | 38.51 | - .06 | 38.565 | 38.565 | 38.40 | 1544 | 1048537 |
| 10:30 - 10:45 | 38.52 | + .01 | 38.51 | 38.58 | 38.50 | 1728 | 1003383 |
| 10:45 - 11:00 | 38.51 | - .01 | 38.535 | 38.56 | 38.50 | 1386 | 946335 |
| 11:00 - 11:15 | 38.96 | + .45 | 38.5125 | 38.98 | 38.51 | 1331 | 468158 |
| 11:15 - 11:30 | 38.99 | + .03 | 38.94 | 39.21 | 38.83 | 926 | 306861 |
| 11:30 - 11:45 | 39.09 | + .10 | 39.00 | 39.09 | 38.86 | 673 | 140456 |
| 11:45 - 12:00 | 39.00 | - .09 | 39.09 | 39.09 | 38.97 | 757 | 227848 |
| 12:00 - 12:15 | 39.01 | + .01 | 38.99 | 39.03 | 38.98 | 701 | 221099 |
| 12:15 - 12:30 | 39.035 | + .025 | 39.005 | 39.14 | 39.00 | 568 | 179398 |
| 12:30 - 12:45 | 39.005 | - .03 | 39.045 | 39.06 | 38.93 | 632 | 122375 |
| 12:45 - 13:00 | 39.01 | + .005 | 39.01 | 39.09 | 38.99 | 307 | 46201 |
| 13:00 - 13:15 | 39.062 | + .052 | 39.01 | 39.088 | 39.01 | 383 | 47032 |
| 13:15 - 13:30 | 39.05 | - .012 | 39.08 | 39.13 | 39.01 | 340 | 51624 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2010 Bloomberg Finance L.P.
SN 102915 H192-971-0 10-Jun-10 11:35:06

GRAB                                                             EquityGIT

11:36           INTRA-DAY  PRICE  INTERVALS    Page 2 /2
CASEY'S GENERAL STORES I (CASY    US)      PRICE 35.83      P    $    DELAYED
Date    4/ 9                       Interval Size (Minutes)      15       USD

| Time Interval | Close | NetChg | Open | High | Low | Tick | Volume |
|---|---|---|---|---|---|---|---|
| | 39.10 | + 7.51 | 38.13 | 39.37 | 37.90 | 34825 | 11584213 |
| | | | | | | | |
| 13:30 - 13:45 | 39.09 | + .04 | 39.05 | 39.14 | 39.05 | 293 | 35844 |
| 13:45 - 14:00 | 39.14 | + .05 | 39.085 | 39.16 | 39.05 | 454 | 64273 |
| 14:00 - 14:15 | 39.305 | + .165 | 39.131 | 39.37 | 39.07 | 962 | 169327 |
| 14:15 - 14:30 | 39.07 | - .235 | 39.31 | 39.34 | 38.96 | 1266 | 263614 |
| 14:30 - 14:45 | 39.19 | + .12 | 39.07 | 39.21 | 39.05 | 665 | 132893 |
| 14:45 - 15:00 | 39.08 | - .11 | 39.195 | 39.21 | 39.02 | 787 | 190186 |
| 15:00 - 15:15 | 39.05 | - .03 | 39.08 | 39.11 | 39.02 | 988 | 192997 |
| 15:15 - 15:30 | 39.06 | + .01 | 39.05 | 39.10 | 39.00 | 988 | 202439 |
| 15:30 - 15:45 | 39.0605 | +.0005 | 39.06 | 39.14 | 39.05 | 1024 | 232257 |
| 15:45 - 16:00 | 39.10 | +.0395 | 39.06 | 39.16 | 39.05 | 1665 | 335975 |
| 16:00 - 16:15 | | | | | | | |
| 16:15 - 16:30 | | | | | | | |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000      Copyright 2010 Bloomberg Finance L.P.
SN 102915 H192-971-0 10-Jun-10 11:36:10

64.    This trading activity further confirms that Couche-Tard intended its Announcement to manipulate Casey's stock price.  It strains credulity to suggest that Couche-Tard could have orchestrated a nearly two million share trade (or trades) within one hour, and perhaps as early as within the first fifteen minutes, of the opening without advanced planning. Couche-Tard's sale represented 17% of the total trading volume during market hours on April 9. Couche-Tard's behavior had to have been premeditated:  it intended its Announcement to cause Casey's stock price to jump and prepared to capitalize on that jump by dumping its shares immediately after the opening bell.    There is no doubt that Couche-Tard intended its Announcement to manipulate Casey's stock price.

65.    According to industry commentators, Couche-Tard reaped at least $10 million in profits from its pump and dump scheme:

> "When merger speculation gets hot, it throws up plenty of trading opportunities. Even acquirers can get in on the action.  It wasn't unusual for Canadian convenience-store operator Alimentation Couche-Tard to own a stake in Casey's General Stores ahead of launching a bid. In the days before making its $36-a-share offer public on April 8, Couche-Tard picked up even more stock at $31.44, increasing its stake to 3.9%.  But rather than keep the position, Couche-Tard cashed in on the hype.  As is common for hostile bids, Casey's shares shot straight through the offer price. That gave Couche-Tard the chance to sell all but a few of its shares on April 9 at $38.43, netting at least $10 million in profit. Yet Couche-Tard still has a $1.9 billion bid on the table at $36 a share.  Why would Couche-Tard sell shares in a company it wants to buy?  Even though Couche-Tard is trying to appoint a slate of directors who will recommend its deal, the stake it had probably wasn't enough to swing the balance.  And it will have kept a token interest to launch a proxy contest.  Meanwhile, if Couche-Tard's takeover attempt fails, it likely won't be hurt by any decline in Casey's share price as it has already booked millions of dollars in profit to help cover its advisory fees.  The question is whether Couche-Tard should be allowed to get a free hedge at the expense of other investors."  (John Jannarone, Alimentation's Marriage of Convenience, Wall Street Journal, C16, June 9, 2010.)

66.    Later on April 9, Mr. Myers sent the following letter to Mr. Bouchard, and Casey's issued a press release that included the letter and described the Board's decision to reject the Couche-Tard proposal:

"Alain Bouchard

President and Chief Executive Officer Alimentation Couche-Tard Inc.

1600, St-Martin Blvd. East

Tower B, Suite 200

Laval (Quebec) H7G 4S7

Dear Mr. Bouchard:

We are very disappointed that you have decided to launch a hostile public campaign regarding your unsolicited proposal to acquire Casey's for $36.00 per share in cash. As we previously informed you, our Board of Directors takes its fiduciary duties very seriously and unanimously determined to reject your proposal after a thorough, thoughtful evaluation of it in consultation with our financial and legal advisors. Your proposal significantly undervalues Casey's and is not in the best interests of the corporation. We are very excited about the many opportunities ahead to continue growing our business and deliver superior value to shareholders.

**Couche-Tard's Opportunistic Proposal Is Attempting to Capture the Significant Current and Long-Term Value That Rightly Belongs to Casey's Shareholders**

As you said in your note to me, we have a great brand and "a recipe that works." We couldn't agree more. Casey's is widely considered a best-in-class operator and consistently maintains industry-leading margins. We have important strategic growth initiatives underway that we expect will contribute meaningfully to our top and bottom lines and increase shareholder value in the near and long-term. Given our consistent outperformance among convenience store operators and our ongoing growth initiatives, along with the fact we own virtually all of our real estate, your proposal vastly undervalues Casey's and our future prospects.

<u>Building on Strong Track Record to Execution and Delivering Value to Shareholders.</u> We are continuing to build on our exceptional track record of performance. We have had positive inside same-store sales growth for 24 consecutive quarters, based in part on the strength of our proprietary prepared food program, and this is a trend we expect to continue. We have the highest inside sales margins in the industry, which have enabled us to achieve double-digit annual EPS growth. Additionally, we have increased our dividend at a compounded annual growth rate of approximately 18% over the past five years.

<u>New-Store Design Rollout and Prepared Food Price Increases Underway.</u> We are in the process of rolling out our new store design that includes an increased cooler capacity, expanded coffee and fountain offerings, and a made-to-order sub-sandwich program. To-date we have incorporated the features of the new store

27

design in 85 of our approximate 1,500 stores, and we are very encouraged by the initial results. We expect these stores to deliver a higher average cash flow and return than our chain-wide average. In addition, the Company implemented price increases on certain products within our prepared food program on March 1, 2010. We expect the price increases will expand margins and boost total prepared food same-store sales approximately 3-4%, in addition to the anticipated positive unit movement.

Expanding Footprint Organically and Through Acquisitions. We are continuing to focus on utilizing our strong balance sheet, which includes approximately $153 million in cash, to expand our footprint through new store openings and strategic acquisitions. Our disciplined approach to acquisitions has served us well, and we will continue to open stores in locations where we can achieve the maximum return on our investment. We also are in the midst of a significant store remodel and replacement initiative that will grow the business by incorporating the features of our new store design mentioned above into our existing store base. Thanks to our exceptional infrastructure, including our distribution network, we have the capacity to support the expansion plans. We expect to update the market on our specific store growth expectations for the next fiscal year during our fourth quarter earnings announcement.

**Couche-Tard Is Trying to Acquire U.S. Companies on the Cheap — Casey's Is Well Positioned to Excel As Economy Recovers**

We believe the timing of your proposal is very opportunistic given the impact of the recession and recent severe weather within our marketing territory. Casey's has navigated the downturn successfully and is extremely well positioned to benefit as the economic recovery continues.

Couche-Tard is Trying to Buy U.S. Companies on the Cheap. In public statements, Couche-Tard has been clear that it believes that U.S. convenience store operators are currently undervalued. As your CFO said: "It's just good for the M&A environment. It's exactly what we did not have in the past two years, that didn't allow us to be able to close good deals." (National Post, March 10, 2010). The 14% premium of your proposal to our closing stock price yesterday, April 8, 2010, underscores that you are attempting to acquire U.S. companies on the cheap. We agree with you that the U.S. convenience store operators are currently undervalued; however, we will not hand over to you the significant long-term value of Casey's that rightly belongs to our shareholders.

Casey's is Well-Positioned to Benefit from the Global Economic Recovery. As economic conditions improve and convenience stores begin to participate more in the current upswing, we believe that our strong operations, ongoing strategic initiatives, and loyal repeat customer base will enable us to accelerate same store sales growth and overall profitability.

**We Are Focused on the Best Interests of Our Shareholders, Employees and the Communities We Serve**

Casey's is in a position of financial and operational strength, which gives us the flexibility to execute a wide variety of strategic initiatives. Our Board of Directors and management team are very enthusiastic about our growth plans and confident in our ability to deliver superior value to shareholders. We are also committed to serving the best interests of our other important constituencies, including our employees and the communities in which we operate, which have been and will continue to be a critical part of our success.

Sincerely,

/s/ Robert J. Myers

Robert J. Myers

President and Chief Executive Officer Casey's General Stores, Inc."

**F.      Couche-Tard's Market Manipulation Prevents Casey's Stock From Reaching Its Full Value.**

67.      Couche-Tard's massive stock dump prevented Casey's share price from reaching its true value. Numerous industry commentators – unaware of Couche-Tard's massive stock dump – made clear that they expected the true value of Casey's stock to be greater than the $39 per share price it ultimately reached. At the time, no one understood why Casey's stock remained artificially depressed:

> "'I don't know if they will go [as] high [as $44] because obviously they're trying to make a very discounted acquisition,' [Ben Brownlow, a Casey's analysis with Morgan, Keegan, and Co.] said in an interview from Tennessee. Brownlow said the Montreal-area retailer is trying to take advantage of a depressed industry by targeting a profitable chain with very loyal customers that could be added to its existing network of 400 stores in the U.S. Midwest." (Casey's General Stores rejects Couche-Tard's US$1.8B hostile takeover bid, Waterloo Chronicle, August 9, 2010.)
>
> "Brent Rystrom, an analyst at Feltl & Co in Minneapolis, Minnesota, said Couche-Tard would have to sweeten its offer substantially if it wants to compete with private equity players. 'We believe it is likely Casey's could find a private equity buyer in this range,' he wrote in a note. 'Alimentation might have to make an offer in excess of $41 to actually close a deal.'" (Scott Anderson, Casey's rejects Couche-Tard's $1.85 billion bid, Reuters, April 9, 2010.)

". . . Michael Smith, a Casey's analyst with Kansas City Capital, said <u>he believes Couche-Tard will have to boost its bid to at least $40</u>. . . . Smith said he's not sure the Iowa company's shareholders are going to be pushed into accepting top dollar today rather than just letting its stock appreciate over time.  'I don't think it's a big enough bid to make shareholders give a (hoot),' he said in an interview." (Ross Marowits, <u>Couche-Tard seeks stores</u>, Waterloo Region Record, April 10, 2010.)

"Todd Vingers, a portfolio manager with Boston-based Lee Munder Capital Group, which holds shares in Casey's, said the deal does not make sense at US$36 a share.  <u>'Seems like a lowball offer, so I'm not sure if their strategy is to play the negotiation game and pay a higher price later on, or if they're just throwing this out there to see if Casey's will bite,'</u> he said in a telephone interview.  'If a higher price comes in I do think Casey's will consider it more seriously, but US$36 is not going to do it.'"  (Eric Lam, <u>Couche-Tard hostile Casey's bid rejected; 'on the cheap'</u>, Financial Post, April 10, 2010, at FP4.)

"So how much might Couche-Tard or another bidder have to offer to get the deal done?
[National Bank Financial analyst James] Durran: <u>As much as $41 a share.</u>
[Desjardins Securities analyst Martin] Landry: Conservatively, $39.
[TD Newcrest analyst Michael] Van Aelst: <u>At least $40.</u>
[Feltl & Co. analyst Brent] Rystrom: $<u>38.50 to $41.</u>"  (Steve Holtz, <u>Exposing a Vulnerability, Who else could buy Casey's General Stores and how much would it cost?</u>, CSP Daily News, April 14, 2010.)

"Justin Akin with Kentuckybased [sic] River Road Asset Management, which managed a portfolio holding 5% of Casey's as late as the end of March, said the offer was 'lowball' and there was no reason to negotiate. . . . [Karin Short, analyst with BMO Capital Markets] estimated the real estate portfolio was worth about US$800 million.  'I don't think it's even worthwhile for the board to discuss at US$36,' [Mr. Brownlow] said.  <u>'I think US$43 or US$44 is where you might get negotiations going.'</u>"  (Eric Lam, <u>Bid for Casey's directed to shareholders; US$1.9B offer; Couche-Tard's hostile offer set at US$36 a share</u>, Financial Post, June 3, 2010, at FP5.)

68.     Casey's stock price did not reflect the $40 - $44 dollar valuation range expressed by analysts because Couche-Tard's massive sale prevented the market from functioning naturally and efficiently.

### G.     <u>Couche-Tard Commences Its Tender Offer.</u>

69.     On June 2, 2010, Couche-Tard commenced its tender offer by filing its Schedule TO with the SEC and issued a press release announcing the commencement of the offer and the

intention to nominate and solicit proxies for the election of a slate of nine directors at the 2010 annual meeting of Casey's shareholders.

**H.    Casey's and its Shareholders Have Suffered Irreparable Harm and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief.**

70.    Casey's market capitalization is less than it would have been had Couche-Tard not artificially capped the run up in Casey's stock following the Announcement.

71.    Casey's remains the target of an inadequate tender offer, the low ball price of which has been made to appear more plausible due to Couche-Tard's artificial manipulations.

72.    In essence, Casey's is being held hostage by Couche-Tard's undisclosed manipulation of its stock price.

73.    Casey's shareholders have sold and, absent injunctive relief, will continue to sell shares of Casey's stock at prices that have been artificially depressed due to Couche-Tard's deceptive and manipulative conduct, under the mistaken belief that the April 9, 2010 market response to Couche-Tard's Announcement of its low ball tender offer was the result of efficient market forces, free from manipulation.

**FIRST CAUSE OF ACTION**
**VIOLATION OF SECTION 14(e) OF THE EXCHANGE ACT**

74.    Plaintiff repeats and realleges paragraphs 1 through 73 hereof as if fully set forth herein.

75.    Couche-Tard, in anticipation of the Announcement, accumulated nearly two million shares of Casey's stock at prices ranging from around $29 to $33 per share.  Couche-Tard accumulated its holdings of Casey's shares, which represented a 3.9% ownership interest in Casey's – i.e., nearly the maximum level of ownership that would allow Couche-Tard to keep its holdings (and its plans) confidential – with the intent to dump its shares when the market price increased in response to the Announcement.  That had two effects:  (i) it allowed Couche-Tard to

31

Case 4:10-cv-00265-JAJ-TJS   Document 1   Filed 06/11/10   Page 32 of 38

reap over $10 million in ill gotten gains; and (ii) it allowed Couche-Tard to artificially depress the run up of Casey's stock price, thereby making its inadequate tender offer appear to be more viable than it actually is. Couche-Tard did not disclose its holdings, nor did it disclose its intention to artificially depress Casey's stock price by dumping virtually its entire position – nearly two million shares – immediately after the market opened on the day of the Announcement. Those omissions made the Announcement misleading.

76.    Couche-Tard's omissions were material. A reasonable investor, in deciding how to invest, would have considered it important that Couche-Tard intended to implement a pump and dump scheme and to artificially depress the price of Casey's stock. Couche-Tard's failure to disclose its holdings, its plan to sell those holdings and its intent to manipulate Casey's stock price to its own advantage altered the total mix of information that should have been available to Casey's shareholders who bought or sold on April 9, 2010, and that should now be available to Casey's shareholders who are deciding whether to tender their shares.

77.    The Announcement, including its materially misleading omissions, was made in connection with a tender offer. Couche-Tard filed the Announcement under Schedule TO-C.

78.    Couche-Tard knew or should have known that its failure to disclose in its Announcement that it held nearly two million shares of Casey's stock – and that it planned to immediately dump those shares in order to reap illicit profits and to artificially depress the price at which Casey's shares otherwise would have traded – was of material importance to an investor deciding whether to sell its shares on the day of the Announcement (and continues to be material to an investor deciding whether to tender its shares). Couche-Tard intended to manipulate the market by making the misleading Announcement. Couche-Tard was under extreme pressure to

32

close a major acquisition and it used the Announcement and the stock dumping scheme to make its low ball offer seem more reasonable to Casey's investors.

79.     Couche-Tard's deliberately misleading Announcement in connection with its tender offer prevented – and, unless enjoined, will continue to prevent – investors from making an informed decision about whether to tender their shares.  Casey's investors have relied upon, and will continue to rely upon, the mistaken belief that the market for Casey's shares was functioning efficiently and that Casey's stock price on April 9, 2010 was, and its current stock price is, a result of non-manipulated market forces, rather than the result of Couche-Tard's heretofore undisclosed plan to manipulate the market to make its low ball offer appear more reasonable.

80.     As a direct and proximate result of the Announcement and sale, Casey's stock price has been artificially depressed.

81.     Couche-Tard therefore has violated Section 14(e) of the Exchange Act.

## SECOND CAUSE OF ACTION
## VIOLATION OF SECTION 14(e) OF THE EXCHANGE ACT AND RULE 14e-8 PROMULGATED THEREUNDER

82.     Plaintiff repeats and realleges paragraphs 1 through 81 hereof as if fully set forth herein.

83.     Couche-Tard violated SEC Rule 14e-8(b) by announcing its plan to make a tender offer with the intent that the misleading Announcement and its immediate dumping of its millions of Casey's shares would manipulate the price of Casey's stock to its own advantage.

84.     Rule 14e-8(b), 17 C.F.R. § 240.14e-8(b), promulgated by the SEC pursuant to Section 14(e) of the Exchange Act, provides that "[i]t is a fraudulent, deceptive or manipulative act or practice within the meaning of Section 14(e) of the Act (15 U.S.C. 78n) for any person to

publicly announce that the person . . . plans to make a tender offer that has not yet been commenced, if the person . . . [i]ntends, directly or indirectly, for the announcement to manipulate the market price of the stock of the bidder or subject company". Reg. § 240.14e-8(b).

85.     On April 9, 2010, before the market opened, Couche-Tard publicly announced – in a press release filed under cover of Schedule TO-C – that it planned to make a tender offer for all outstanding shares of Casey's common stock.  That tender offer had not yet commenced. Couche-Tard intended for the Announcement to manipulate the price of Casey's stock by causing the market to open at a substantially increased price over the prior day's closing price. Couche-Tard intended for its Announcement to have this effect so that Couche-Tard could immediately dump its nearly two million shares at a substantial premium over the price at which it purchased its shares of Casey's stock, thereby reaping illicit profits and, at the same time, depressing the run up that otherwise would have followed from the announcement of Couche-Tard's takeover bid.  Couche-Tard intended to – and did – manipulate Casey's stock price to its own advantage.

86.     As Couche-Tard predicted and intended, the market in fact opened at a 21% increase over the prior day's closing, and Couche-Tard, in accordance with its scheme to manipulate the stock price to its own advantage, immediately sold its nearly two million shares within the first hour of the market opening, at $38.43 per share.  That massive sale prevented Casey's share price from moving as high as it otherwise would have.

87.     The speed at which Couche-Tard effected this massive sale indicates that Couche-Tard expected and intended for its Announcement to manipulate the market price of Casey's shares, allowing Couche-Tard to realize substantial profits from the manipulative effects of its

Announcement.  Couche-Tard could not have made such a large sale on the spur of the moment. The size and swiftness of Couche-Tard's sale reveals the premeditated nature of its acts.

88.    Couche-Tard was under extreme pressure to close a major acquisition and it used the Announcement and the stock dumping scheme to make its low ball tender offer seem more reasonable.  In short, Couche-Tard's manipulative acts had two effects:  (i) they allowed Couche-Tard to reap over $10 million in ill gotten gains; and (ii) they allowed Couche-Tard to artificially depress the run up of Casey's stock price, thereby making its inadequate tender offer appear to be more reasonable than it actually is.

89.    By intending for its public Announcement to manipulate the market price of Casey's shares, Couche-Tard committed a fraudulent, deceptive and manipulative act and practice within the meaning of Section 14(e) of the Exchange Act, and therefore has violated that Section and Rule 14e-8(b) promulgated thereunder.

### THIRD CAUSE OF ACTION
### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER—MARKET MANIPULATION

90.    Plaintiff repeats and realleges paragraphs 1 through 89 hereof as if fully set forth herein.

91.    Couche-Tard engaged in market manipulation in violation of Rule 10b-5(a) and (c), promulgated under Section 10(b) of the Exchange Act.

92.    Specifically, Couche-Tard intentionally or recklessly manipulated the NASDAQ trading mechanism and/or other national securities exchanges so as to depress the tender offer run up that it knew would result from its Announcement and that Couche-Tard knew would surpass the price at which Couche Tard would be willing to (and might obtain the means to) consummate the tender offer.  It did this by announcing its intent to acquire all outstanding

shares of Casey's stock at a low ball price of $36 per share, and immediately thereafter dumping its nearly two million Casey's shares into the open market.

93.     As a result, Couche-Tard employed a device, scheme or artifice to defraud and/or engaged in acts, practices or a course of business which was intended to, did and, unless enjoined, will continue to deceive the investing public as to the efficiency of the market for Casey's stock, and which, unless enjoined, risks allowing Couche-Tard to consummate its tender offer at a below-market price that investors would not pay if they knew of Couche-Tard's unlawful, manipulative conduct.

94.     Couche-Tard manipulated the market in connection with the purchase and sale of shares of Casey's stock.

95.     Couche-Tard intended to manipulate the market through its misleading Announcement, manipulative stock dumping and low ball tender offer.  Couche-Tard was under extreme pressure to close a major acquisition and it used the Announcement and the stock dumping scheme to make its low ball offer seem more reasonable to Casey's investors.

96.     Casey's investors have relied upon, and will continue to rely upon, the mistaken belief that the market for Casey's shares was functioning efficiently and that Casey's stock price on April 9, 2010 was, and its current stock price is, a result of non-manipulated market forces, rather than the result of Couche-Tard's heretofore undisclosed plan to manipulate the market to make its low ball tender offer appear more reasonable.

97.     As a direct and proximate result of Couche-Tard's April 9, 2010 dumping of its nearly two million shares of Casey's stock immediately after its announced intention to acquire all outstanding shares of such stock, Casey's stock price has been artificially depressed, and its

shareholders have sold and, absent injunctive and/or declaratory relief, will continue to sell such shares at a price artificially depressed by Couche-Tard's deceptive and manipulative conduct.

98.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Casey's respectfully requests that this Court issue an order:

99.   Declaring that Couche-Tard's April 9, 2010, Announcement of its intention to make a tender offer for Casey's shares, without disclosing the fact that it held nearly two million shares of Casey stock and intended to dump its Casey's holdings immediately after its Announcement in order to artificially depress the market price of Casey's stock – and then, in fact, dumping its Casey's stock, reaping illicit profits and artificially depressing Casey's stock price – was in violation of Section 14(e) of the Exchange Act, and Rule 14e-8 promulgated thereunder;

100.   Declaring that Couche-Tard's April 9, 2010, Announcement and immediate sale of Casey's stock with the intent to reap illicit profits and to artificially depress the market price of Casey's stock was in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder;

101.   Directing Couche-Tard to make full and complete corrective disclosure to Casey's shareholders regarding its manipulative scheme to reap illicit profits and artificially depress the market price of Casey's stock;

102.   Enjoining Couche-Tard from manipulating or attempting to manipulate the market price of Casey's stock;

103.    Enjoining Couche-Tard and ACT from taking further steps to consummate the tender offer and from purchasing shares of Casey's;

104.    Awarding Plaintiff its costs and disbursements incurred in this action; and

105.    Such other and further relief as the Court may deem just and proper.

June 11, 2010

AHLERS & COONEY, P.C.

by

/s/ Edward W. Remsburg

Edward W. Remsburg (AT0006511)
  AHLERS & COONEY, P.C.
  100 Court Avenue, Suite 600
  De Moines, IA 50309
  Telephone:  (515) 243-7611
  Facsimile:  (515) 243-2149
  Email:  eremsburg@ahlerslaw.com

*Attorneys for Plaintiff Casey's General Stores Inc.*

OF COUNSEL:

Robert H. Baron
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
Email:  RBaron@cravath.com

659424.1 /MSWord