**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| CASEY'S GENERAL STORES, INC., <br><br> Plaintiff, <br><br> -against- <br><br> ALIMENTATION COUCHE-TARD INC., ACT ACQUISITION SUB, INC., <br><br> Defendants. | **Civil Action No.  4:10-cv-265** <br><br> **MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION** <br><br> **ECF CASE** |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 5

    A.    The Parties. ....................................................................................................... 5

    B.    Couche-Tard Publicly Commits To Massive Expansion of Its Operations. ............. 5

    C.    Couche-Tard Accumulates Nearly Two Million Shares of Casey's Stock. ............. 7

    D.    Couche-Tard Makes Casey's A Low Ball Offer, Which Casey's Rejects. ............. 9

    E.    It Would Be Detrimental to Couche-Tard To Pay Full Value for Casey's
        Shares. ............................................................................................................. 10

    F.    Couche-Tard Reaps Illicit Profits and Artificially Depresses the Value of
        Casey's Stock By Dumping Nearly Two Million Casey's Shares Into the
        Market Immediately After Announcing Its Intent to Make Its Low Ball
        Tender Offer to Casey's Shareholders. ................................................................. 12

    G.    Couche-Tard's Market Manipulation Prevents Casey's Stock From
        Reaching Its Full Value. ..................................................................................... 15

    H.    Casey's Rejects the April 9 Offer and Couche-Tard Commences Its
        Tender Offer. ..................................................................................................... 17

ARGUMENT ................................................................................................................... 18

I.    CASEY'S HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE
    MERITS. .................................................................................................................. 18

    A.    Casey's Is Likely to Prevail on its Section 10(b) and Rule 10b-5 Claims. ............. 19

    B.    Casey's Is Likely to Prevail on its Section 14(e) Claim. ........................................ 24

    C.    Casey's Is Likely to Prevail on its Rule 14e-8 Claim. ........................................... 26

II.    CASEY'S WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY
    INJUNCTIVE RELIEF. ........................................................................................... 27

III.    THE BALANCE OF HARMS FAVORS PRELIMINARY INJUNCTIVE
    RELIEF. ................................................................................................................... 30

IV.     THE PUBLIC'S INTEREST FAVORS PRELIMINARY INJUNCTIVE RELIEF. ........31

CONCLUSION.................................................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

B & D Land and Livestock Co. v. Conner,
   534 F. Supp. 2d 891 (N.D. Iowa 2008).............................................................. passim

Baker Elec. Co-Op. v. Chaske,
   28 F.3d 1466 (8th Cir. 1994) ............................................................................18

Broder v. Dane,
   384 F. Supp. 1312 (S.D.N.Y. 1974).................................................................30

Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc.,
   307 F. Supp. 910 (S.D.N.Y. 1969) ...................................................................28

Chambers v. Briggs & Stratton Corp.,
   863 F. Supp. 900 (E.D. Wis. 1994)..................................................................31

Champion Parts Rebuilders, Inc. v. Cormier Corp.,
   650 F. Supp. 87 (N.D. Ill. 1986) ......................................................................28

Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,
   480 F.2d 341 (2d Cir. 1973)........................................................................24, 26

Clearfield Bank & Trust Co. v. Omega Fin. Corp.,
   65 F. Supp. 2d 325 (W.D. Pa. 1999).................................................................26

Corsair Capital Partners, L.P. v. Wedbush Morgan Sec., Inc.,
   No. CV-99-04670-ER, 2001 WL 1631487 (9th Cir. Dec. 19, 2001) .......................19

Cowen & co. v. Merriam,
   745 F. Supp. 925 (S.D.N.Y. 1990) ...................................................................19

Crane Co. v. Westinghouse Air Brake Co.,
   419 F.2d 787 (2d Cir. 1969)........................................................................21, 22

Curtis 1000, Inc. v. Youngblade,
   878 F. Supp. 1224 (N.D. Iowa 1995)............................................................18, 24

Dataphase Sys., Inc. v. CL Sys., Inc.,
   640 F.2d 109 (8th Cir. 1981) (en banc) .............................................................18

Elec. Specialty Co. v. Int'l Controls Corp.,
   409 F.2d 937 (2d Cir. 1969)............................................................................21

i

**Page(s)**

Ernst & Ernst v. Hochfelder,
    425 U.S. 185, 193 (1976) ...................................................................................22

Fin. Gen. Bankshares, Inc. v. Lance,
    No. 78-0276, 1978 WL 1082 (D.D.C. Apr. 27, 1978).............................................29

Gas Natural v. E.ON AG,
    468 F. Supp. 2d 595 (S.D.N.Y. 2006)..............................................................24, 26

Gen. Steel Indust., Inc. v. Walco Nat'l Corp.,
    No. 81-1410-C, 1981 WL 17552 (E.D. Mo. Nov. 24, 1981)...................................29

Glenwood Bridge, Inc. v. City of Minneapolis,
    940 F.2d 367 (8th Cir. 1991) ..........................................................................18, 27

Hanna Mining Co. v. Norcen Energy Res. Ltd.,
    574 F. Supp. 1172 (N.D. Ohio 1982)..........................................................25, 26, 29

Herman & MacLean v. Huddleston,
    459 U.S. 375 (1983)...........................................................................................22

Hevesi v. Citigroup Inc.,
    366 F.3d 70 (2d. Cir. 2004)................................................................................21

In re Charter Commc'ns., Inc. Sec. Litig.,
    443 F. 3d 987 (8th Cir. 2006) ........................................................................19, 20

In re Eng'g Animation Sec. Litig.,
    110 F. Supp. 2d 1183 (S.D. Iowa 2000) ...............................................................22

In re Initial Pub. Offering Sec. Lit.,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)............................................................19, 24

In re Time Warner Inc. Sec. Lit.,
    9 F.3d 259 (2d Cir. 1993)...................................................................................22

Lewis v. Gen. Emp. Enters.,
    No. 91 C 0291, 1991 WL 11383 (N.D. Ill. Jan. 21, 1991) .....................................32

Lewis v. McGraw,
    495 F. Supp. 27 (S.D.N.Y. 1979) .......................................................................25

Life Investors, Inc. v. Ago Holding, N.V.,
    No. 81-2065, 1981 WL 15483 (8th Cir. 1981) ................................................26, 28

Markowski v. SEC,
    274 F.3d 525 (D.C. Cir. 2001) ...........................................................................20

Page(s)

Monarch Prods., LLC v. Zephyr Grafix, Inc,
    No. 4:09CV02049 ERW, 2010 WL 1837711 (E.D. Mo. May 4, 2010) ...................................18

Otis Elevator Co. v. United Techs. Corp.,
    405 F. Supp. 960 (S.D.N.Y. 1975) ........................................................................................31

Pagel, Inc. v. SEC,
    803 F.2d 942 (8th Cir. 1986) ..................................................................................................22

Ryko Mfg. Co. v. Eden Servs.,
    759 F.2d 671 (8th Cir. 1985) ..................................................................................................27

Santa Fe Indust., Inc. v. Green,
    430 U.S. 462 (1977).................................................................................................................19

Schuster v. Anderson,
    413 F. Supp. 2d 983 (N.D. Iowa 2005)...................................................................................22

SEC v. Rana Research, Inc.,
    8 F.3d 1358 (9th Cir. 1993) ..............................................................................................19, 23

SEC v. Softpoint, Inc.,
    958 F. Supp. 846 ....................................................................................................................23

Sonesta Int'l Hotels Corp. v. Wellington Assocs.,
    483 F.2d 247 (2d Cir. 1973).......................................................................................28, 30, 31

Standard Fin., Inc. v. LaSalle/Kross Partners, L.P.,
    No. 96 C 8037, 1997 WL 80946 (N.D. Ill. Feb. 20, 1997)...............................................30, 31

United States v. Regan,
    937 F.2d 823 (2d Cir. 1991).....................................................................................................26

United States v. Royer,
    549 F.3d 886 (2d Cir. 2008).....................................................................................................20

United States v. Russo,
    74 F.3d 1383 (2d Cir. 1996).....................................................................................................19

Uncle B's Bakery, Inc. v. O'Rourke,
    920 F. Supp. 1405 (N.D. Iowa 1996)................................................................................19, 31

United States v. Charnay,
    537 F.2d 341 (9th Cir. 1976) ...................................................................................................21

USG Corp. v. Wagner & Brown,
    690 F. Supp. 625 (N.D. Ill. 1987) ...........................................................................................28

<div align="right">**Page(s)**</div>

**Statutes & Rules**

15 U.S.C. § 18.................................................................................................................................9

15 U.S.C. § 78n(e) .........................................................................................................................26

Federal Rule of Civil Procedure 65 ...............................................................................................1

Local Rule 65 ..................................................................................................................................1

15 U.S.C. §78j(b) (hereinafter "Section 10(b)")..............................................................19, 20, 21

17 C.F.R. § 240.10b-5 (hereinafter "Rule 10b-5") .........................................................19, 20, 21

Rule 14d-1.....................................................................................................................................24

15 U.S.C.A. §78n(e) (hereinafter "Section 14(e)") ......................................................................24

17 C.F.R. § 240.14e-8 (hereinafter "Rule 14e-8")...........................................................…………..26

## EXPLANATION OF CITATION CONVENTIONS

The following citation forms are used in this memorandum:

- "Earnhardt Declaration" or "Earnhardt Decl." for references to the Declaration of J. Wes Earnhardt, dated June 18, 2010.

- "Ex." for references to documents attached as exhibits to the Earnhardt Declaration.

- "Couche-Tard Schedule TO" for references to the Schedule to (Rule 14d-100) Tender Offer Statement Pursuant to Section 14(d)(1) or 13(e)(1) of the Securities Exchange Act of 1934 (Schedule TO-T), filed by Couche-Tard with the SEC on June 2, 2010, and attached as Ex. R to the Earnhardt Declaration.

- "Casey's June 8, 2010 Form 14D-9" for references to Casey's General Stores, Inc. Solicitation/Recommendation Statement Under Section 14(d)(4) of the Securities Exchange Act of 1934 (Schedule 14D-9), filed with the SEC on June 8, 2010, and attached as Ex. V to the Earnhardt Declaration.

- "Couche-Tard's Notice of Nomination" for references to Couche-Tard's letter to Casey's General Stores, Inc. regarding Shareholder Notice of Nomination of Persons for Election as Directors and Proposal of Shareholder Business at the 2010 Annual Meeting of Shareholders of Casey's General Stores, Inc., dated June 7, 2010, and attached as Ex. U to the Earnhardt Declaration.

- "Casey's Trading History" for references to a chart of the daily opening, closing, high and low prices and trading volume of Casey's General Stores, Inc. (CASY) from September 24, 2009 through June 10, 2010, downloaded from http://banker.thomsonib.com, and attached as Ex. Y to the Earnhardt Declaration.

- "4/9/10 Couche-Tard TO-C" for references to the Schedule to (Rule 14d-100) Tender Offer Statement Pursuant to Section 14(d)(1) or 13(e)(1) of the Securities and Exchange Act of 1934 (Schedule TO-C), filed by Alimentation Couche-Tard, Inc. with the SEC on April 9, 2010, and attached as Ex. D to the Earnhardt Declaration.

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65, Plaintiff Casey's General Stores, Inc. ("Casey's" or "the Company") respectfully submits this memorandum of law in support of its Motion for a Preliminary Injunction against defendants Alimentation Couche-Tard Inc. and ACT Acquisition Sub, Inc. (together, "Couche-Tard").

## PRELIMINARY STATEMENT

This case involves an egregious market manipulation scheme perpetrated by Couche-Tard in an attempt to acquire Casey's at an artificially deflated price. By announcing its intent to acquire Casey's in a hostile takeover – and then immediately dumping nearly two million shares of Casey's stock on the open market – Couche-Tard simultaneously: (i) reaped millions of dollars of profit in a classic "pump and dump" scheme; and (ii) artificially depressed the run up in Casey's stock price that otherwise would have followed the announcement of Couche-Tard's takeover bid, thereby making Couche-Tard's low ball tender offer appear more reasonable than it actually is. Couche-Tard should be enjoined from capitalizing any further on its misdeeds.

For the last several years, Couche-Tard has promised Wall Street analysts and its own investors that it would double the size of its operations by, among other things, conducting a blockbuster acquisition of a large United States convenience store chain. However, due to market forces and its own financing constraints, Couche-Tard has been unable to make such an acquisition. As a result, analysts and investors have become increasingly skeptical that Couche-Tard will be able to execute its aggressive business plan. In Fall 2009, faced with mounting pressure, Couche-Tard decided to pull out all the stops to acquire a large convenience store company in the United States.

It set its sights on Casey's. Casey's has consistently outperformed its peer companies, has best in class food service and has enjoyed a rising stock price during the last

several years – while its peers' stock prices have fallen.  In short, Casey's has tremendous long-term value that rightly belongs to its shareholders.

Couche-Tard set out to capture that long-term value for itself.  However, because Couche-Tard is constrained in the amount it can spend on an acquisition, and because Casey's intrinsic value is prohibitively high, Couche-Tard recognized that it could only acquire Casey's if it could manage to do so at an artificially low price.

To that end, in September 2009, Couche-Tard methodically and invisibly began acquiring an ownership position in Casey's.  Over the next several months, Couche-Tard made over 40 discreet purchases of Casey's stock in the open market.  It continued buying Casey's stock as late as April 7 and 8, 2010, acquiring over 50,000 shares on those two dates alone.  By April 9, 2010, Couche-Tard had acquired nearly <u>two million</u> Casey's shares.  Having reached that level of ownership – the maximum ownership at which it could keep its holdings (and its plan) confidential – Couche-Tard implemented the second phase of its scheme.

Before the markets opened on April 9, Couche-Tard publicly announced that it intended to commence a tender offer for all outstanding Casey's shares (the "Announcement"). The Announcement did not even mention Couche-Tard's ownership interest in Casey's – which represented 3.9% of all outstanding shares – let alone its plan to sell nearly all of those shares back into the market shortly after the Announcement.  It simply disclosed Couche-Tard's intent to acquire all outstanding Casey's shares at $36 per share (the "Offer Price").

As Couche-Tard anticipated and intended, the Announcement caused an immediate jump in Casey's stock price.  Casey's shares closed at $31.59 on April 8; following the Announcement, Casey's shares opened at $38.13 on April 9, a 21% increase.

Couche-Tard did not waste any time capitalizing on the Announcement. Immediately after the opening of the market, and without making any additional disclosure,

Couche-Tard dumped essentially all of its Casey's stock into the market – 1,975,000 shares in total – at $38.43 per share.  Couche-Tard netted nearly $14 million dollars in profit from that sale.  Nearly two months later, Couche-Tard revealed – for the first time – that it had amassed its large position in Casey's stock before making the Announcement and that it had sold its Casey's stock on April 9, 2010 "in **an** open market sale" "at **a** price of $38.43 per Share" right after the Announcement.  (Couche-Tard Schedule TO (Earnhardt Decl. Ex. R) at 31.)  The trading data indicate that this sale must have happened within the first hour of the April 9 trading day.

In other words, Couche-Tard sold nearly two million shares of Casey's stock – at a profit of nearly $14 million – immediately after announcing its intent to launch a hostile takeover of Casey's.  Couche-Tard did not even mention its ownership of Casey's stock – let alone its plan to dump that stock – in the press release it issued just hours before it made its massive sale.  Indeed, for nearly two months after the Announcement, Couche-Tard kept secret both that it had owned those shares and that it had sold nearly all of them.

The egregious nature of Couche-Tard's conduct speaks for itself.  It is a classic "pump and dump" scheme – Couche-Tard announced a hostile tender offer and, when the tender offer had its planned effect of increasing the stock price (the pump), Couche-Tard sold virtually all of its shares at a lavish profit (the dump).  Had Couche-Tard informed the market that it planned to sell nearly two million shares of Casey's stock immediately after the opening, Casey's stock would not have jumped as much as it did in response to Couche-Tard's takeover bid.  Adequate disclosure would have cost Couche-Tard millions of dollars.  Inadequate disclosure manipulated Casey's share price to Couche-Tard's advantage.

But that was only the first aspect of Couche-Tard's market manipulation scheme.  Couche-Tard also benefited by announcing its $36 tender offer – a low ball offer that it knows has no chance of succeeding under non-manipulated market conditions – immediately before

3

dumping its stock.  In essence, the massive sale, undisclosed in the Announcement of the low ball offer, prevented Casey's stock from gaining as much as it would have under normal, efficient market conditions, i.e., Couche-Tard's massive sale artificially depressed Casey's post-Announcement stock price.  That artificial depression made Couche-Tard's current $36 per share offer – made on June 2, 2010 – appear more plausible than it should have, or would have absent the manipulation.

Couche-Tard's plan allowed it to have its cake and eat it too.  On the one hand, Couche-Tard took advantage of the jump in share price by selling a massive block of shares for a massive profit.  It also hedged against the risk that Casey's stock price would drop when its inadequate takeover bid fails – it now has nothing to lose because it has virtually liquidated its position in Casey's.  On the other hand, that same massive sale prevented Casey's share price from reaching its true value, which would have doomed Couche-Tard's attempt to acquire Casey's with its low ball tender offer, and which would have revealed even more dramatically how inadequate Couche-Tard's Offer Price is.

Couche-Tard should be enjoined from taking further advantage of its manipulative scheme.  If allowed to continue unabated, the hostile tender offer – and Couche-Tard's attempt to wrest ownership and control of Casey's from its shareholders for an inadequate price – likely will come to a head at Casey's annual meeting in mid-September.  Casey's seeks an order prior to that meeting (i) directing Couche-Tard to make full and complete corrective disclosure to Casey's shareholders regarding Couche-Tard's manipulative scheme; (ii) enjoining Couche-Tard from further manipulating or attempting to manipulate the market price of Casey's stock; and (iii) enjoining Couche-Tard from taking further steps to consummate Couche-Tard's tender offer.

## BACKGROUND

**A.     The Parties.**

Couche-Tard is the largest independent convenience store operator in North America.  It operates nearly 5,900 stores in Canada and the United States.  (Couche-Tard Schedule TO (Earnhardt Decl. Ex. R) at 19.)  Throughout its history, Couche-Tard has grown its business by acquiring other convenience store operators and, within the last ten years, has dramatically expanded its presence in the United States by acquiring a number of convenience store companies headquartered here.  In 2003, for example, it bought Circle K's over 1,600 United States stores.  (Our Company; History, Alimentation Couche-Tard, Inc. (Earnhardt Decl. Ex. Z), http://www.couche-tard.com/corporatif/history.html, last visited June 14, 2010.)

Casey's also owns and operates convenience stores.  It was founded in Iowa in 1967.  From its roots as a single store in Des Moines, it has grown to 1,513 stores located in nine Midwestern states, primarily Iowa, Illinois and Missouri.  (About Casey's, Casey's (Earnhardt Decl. Ex. C), http://www.caseys.com/about_us_html, last visited June 14, 2010.)  Casey's has consistently outperformed its peers, posting same-store sales growth for 25 consecutive quarters.  (Casey's June 8, 2010 Form 14D-9 (Earnhardt Decl. Ex. V) at 14.)  During the three year period ending April 8, 2010, Casey's stock increased 24%, compared to an average decrease of 46% for its convenience store peer group and a decrease of 18% for the S&P 500.  (Id. at 15.)  In short, Casey's has tremendous current and long-term value that rightly belongs to its shareholders.

**B.     Couche-Tard Publicly Commits To Massive Expansion of Its Operations.**

Over the last several years, Couche-Tard has promised its investors that it will increase shareholder value by undertaking a massive expansion, fueled in part by large acquisitions.  As reported in the press on April 9, 2010, "Mr. Bouchard [Couche-Tard's President and CEO] and other senior executives had been telling analysts and media for years that they

were actively looking for another major deal similar in size to the Circle-K transaction . . . . There have been several modest acquisitions by Couche-Tard since Circle-K, but nothing close to the magnitude of the proposed Casey's deal." (Bertrand Marotte, Couche-Tard's Big U.S. Bid Rejected; Convenience Store Operator's $1.9 Billion (U.S.) Offer for Casey's General Stores Dismissed as Too Low, The Globe and Mail, Apr. 9, 2010 (Earnhardt Decl. Ex. H).)

In fact, Couche-Tard's corporate strategy depends upon Couche-Tard doubling in size over the next several years. Investors and the press are well aware of this aggressive expansion strategy:

> "Mr. Bouchard recently reaffirmed the corporate strategy of doubling the existing 5,883 stores within the next several years." (Id.)

> "Couche-Tard, which has grown steadily through acquisitions over the years, has made no secret that it is on the prowl for more deals in the United States. It told analysts that it was looking for another big buy similar to its $804 million purchase of the Circle K chain, which it closed in 2003." (Scott Anderson, Update 4-Casey's Rejects Couche-Tard's $1.85 Bln Bid, Reuters News, Apr. 9, 2010 (Earnhardt Decl. Ex. F).)

Couche-Tard has gone to the market with its plan of acquiring a large company and, eventually, doubling the size of its operations. Investors have paid close attention to whether Couche-Tard will be able to execute this strategy:

> "For years, investors in Alimentation Couche-Tard Inc. . . . speculated about when chief executive officer Alain Bouchard would score another blockbuster deal after the 2003 acquisition of the Circle K convenience-store chain in the U.S." (Bertrand Marotte, Couche-Tard makes fresh push into U.S.; Quebec-based Convenience Store Giant Launches Hostile $1.9-billion (U.S.) Hostile Bid for Midwest Chain, The Globe and Mail, April 10, 2010, at B3 (Earnhardt Decl. Ex. J).)

Despite its lofty promises to its investors, Couche-Tard has been unable to make a major acquisition (i.e., an acquisition involving more than 1,000 stores) since it acquired Circle K in 2003. A continued failure to execute its strategy would not only cost management significant credibility in the market, it also would severely hamper Couche-Tard's stock price.

Indeed, several industry commentators have questioned whether Couche-Tard can execute a successful business plan without making a large acquisition.

> "[A]nalysts said it's unlikely the stock will do much until Couche-Tard can bag another major acquisition on the level of its 2003 purchase of the U.S.-based Circle K chain."  (Sean Silcoff, Couche-Tard Investors Eager For Next Buy; Q4 Profit Up; Acquisition Needed To Boost Stock Out Of 'Ho-Hum Story': Analysts, Nat'l Post's Fin. Post & FP Investing, July 18, 2007, at FP5 (Earnhardt Decl. Ex. A).)

> "Growth by acquisition in this low growth / fragmented industry continues to be integral to the company's long-term approach to value creation, and on yesterday's webcast [Couche-Tard's] CEO Alain Bouchard reiterated that the Company is actively looking for acquisition opportunities."  (Re-Setting the Pump: Q3 Results Reflect Gas Prices, Weak Economy, RBC Capital Markets, March 10, 2010 (Earnhardt Decl. Ex. B).)

Thus, Couche-Tard's management was under extreme pressure in late 2009 and early 2010 to make a game changing acquisition in the near term, but it had fallen behind its own strategic plan  (See, e.g., Dean Best, Comment: Long Road ahead for Couche-Tard in Casey's pursuit, Just Food, Apr. 13, 2010 (Earnhardt Decl. Ex. M) ("Couche-Tard, which has been aggressive in its acquisitions south of the [Canadian] border . . . had put the brake on its M&A activity during the recession.").)

### C.    Couche-Tard Accumulates Nearly Two Million Shares of Casey's Stock.

In Fall 2009, Couche-Tard – facing pressure from investors and Wall Street analysts – set out to capture Casey's tremendous value.  Couche-Tard knew that it would be commercially impractical for it to purchase all of Casey's stock at a share price that represents Casey's true value.  Thus, to satisfy its investors' appetite for a large acquisition that would immediately enhance Couche-Tard's earnings, Couche-Tard set out to acquire Casey's at an artificially deflated price.

To that end, starting in September 2009, Couche-Tard methodically – and invisibly – began acquiring a substantial equity interest in Casey's.  By October 5, 2009, it had

purchased over 140,000 Casey's shares – without even having broached the topic of a strategic

transaction with Casey's.  (Couche-Tard Notice of Nomination (Earnhardt Decl. Ex. U) at C-5-

C-6.)  According to Couche-Tard's Notice of Nomination delivered to Casey's, it acquired

1,975,362 shares of Casey's stock between September 2009 and April 8, 2010, by making the

following purchases on the following dates:

| Date of Purchase or Sale | Amount Purchased or (Sold) |
|---|---|
| 09/24/2009 | 102,800 |
| 09/25/2009 | 17,200 |
| 10/02/2009 | 400 |
| 10/05/2009 | 21,400 |
| 10/14/2009 | 300 |
| 10/16/2009 | 30,400 |
| 10/19/2009 | 6,900 |
| 10/20/2009 | 51,005 |
| 10/21/2009 | 170,500 |
| 10/22/2009 | 9,107 |
| 10/23/2009 | 37,600 |
| 10/26/2009 | 13,700 |
| 10/27/2009 | 23,900 |
| 10/28/2009 | 42,700 |
| 10/29/2009 | 67,700 |
| 10/30/2009 | 122,800 |
| 11/02/2009 | 114,200 |
| 11/03/2009 | 85,800 |
| 11/04/2009 | 29,700 |
| 11/05/2009 | 31,800 |
| 11/06/2009 | 68,838 |
| 11/10/2009 | 9,600 |
| 11/11/2009 | 59,100 |
| 11/12/2009 | 90,400 |
| 11/13/2009 | 119,500 |
| 11/30/2009 | 69,900 |
| 12/01/2009 | 8,200 |
| 12/03/2009 | 73,800 |
| 12/04/2009 | 3,900 |
| 12/08/2009 | 139,400 |
| 12/09/2009 | 13,200 |
| 12/17/2009 | 33,126 |
| 12/18/2009 | 36,705 |
| 03/24/2010 | 24,442 |
| 03/25/2010 | 40,542 |
| 03/26/2010 | 28,800 |

| 03/29/2010 | 45,666 |
|:---:|:---:|
| 03/30/2010 | 32,212 |
| 03/31/2010 | 28,023 |
| 04/01/2010 | 17,002 |
| 04/05/2010 | 100 |
| 04/07/2010 | 39,894 |
| 04/08/2010 | 13,100 |

(Id.)  Couche-Tard purchased those Casey's shares at prices ranging from around $29 to $33 per share.  (Casey's Trading History (Earnhardt Decl. Ex Y).)  Couche-Tard was careful to keep its total purchases of Casey's stock at the maximum level at which it could still maintain the secrecy of its holdings (and the secrecy of its plan).  See Clayton Act § 7A, 15 U.S.C. § 18A(a)(2)(B)(i) (requiring disclosure once acquiror owns shares totaling $63 million in value).

**D.     Couche-Tard Makes Casey's A Low Ball Offer, Which Casey's Rejects.**

On October 6, 2009, Mr. Robert J. Myers, President and Chief Executive Officer of Casey's, had a telephone conversation with Mr. Alain Bouchard, President and Chief Executive Officer of Couche-Tard, that was intended to be a discussion regarding how credit card interchange fees are impacting the convenience store industry.  (Casey's June 8, 2010 Form 14D-9 (Earnhardt Decl. Ex. V) at 8.)  During that call, Mr. Bouchard asked Mr. Myers if Casey's would consider a strategic alliance with Couche-Tard.  Mr. Myers said that the Company was excited about its strategic plan and was not interested in such an alliance.  (Id.)

On November 16, 2009, Mr. Myers and Mr. Bouchard had a telephone conversation during which Mr. Bouchard suggested that a strategic alliance between Casey's and Couche-Tard would be beneficial for both companies.  (Id.)  Mr. Myers again informed Mr. Bouchard that the Company was not interested in such an alliance, and advised Mr. Bouchard to put any offer in writing for submission to the Board for consideration.  (Id.)

On March 9, 2010, Mr. Myers received a letter from Mr. Bouchard.  (Id. at 9.)  The letter contained a non-binding proposal to acquire 100% of the outstanding Casey's

Common Shares at a price of $36.00 per share in cash.  (Id.)  That same day, Mr. Myers notified

the Board and other members of senior management of Couche-Tard's unsolicited proposal.

(Id.)

On March 23, 2010, at a regularly scheduled meeting of the Board in Ankeny,

Iowa, and again on March 25, 2010, at a meeting of the Board held by teleconference, the Board

met with members of senior management, as well as the Company's legal advisors, and

Goldman, Sachs & Co., the Company's financial advisor.  (Id. at 10.)  The Board carefully

considered the strategic, financial and legal aspects of Couche-Tard's proposal and the nature

and timing of the proposal.  (Id.)  On March 25, 2010, at a meeting of the Board held by

teleconference, the Board unanimously determined that Couche-Tard's proposal was not in the

best interests of the Company and unanimously determined to reject Couche-Tard's proposal.

(Id.)  Mr. Myers informed Mr. Bouchard of the Board's decision on March 29, 2010.  (Id.)

On March 30, 2010, Mr. Bouchard again wrote to Mr. Myers, repeating Couche-

Tard's offer to acquire the Company for $36 per share.  (Id. at 10-11.)  On April 5, 2010, at a

meeting of the Board held by teleconference, the Board met with members of senior

management and representatives of its legal and financial advisors.  (Id. at 11.)  During this

meeting, the participants discussed the March 30th letter from Mr. Bouchard.  (Id.)  On April 7,

2010, Mr. Myers wrote to Mr. Bouchard, rejecting Couche-Tard's latest offer.  (Id. at 12.)

**E.**      **It Would Be Detrimental to Couche-Tard To Pay Full Value for Casey's Shares.**

Couche-Tard's low ball offer of $36 per share is easily explained.  As analysts,

commentators and rating agencies have stated since Couche-Tard's takeover bid became public,

Couche-Tard simply does not have the financial wherewithal to complete a tender offer at a price

reflecting Casey's true value.

Among other things, Couche-Tard does not have the cash or credit on hand to

acquire Casey's shares even at the current $1.9 billion total price:

> "Alimentation Couche-Tard would have to find at least $2 billion to acquire Casey's, especially since the Quebec giant wants to pay cash."  (Carl Renaud, <u>Casey's Rejects Couche-Tard Offer</u>, Sarnia Observer, Apr. 10, 2010, at B7 (Earnhardt Decl. Ex. L).)

> "Couche-Tard lost . . . easy access to money it needs to fund this takeover. Couche-Tard has more than $600-million of cash and existing credit available, and is clearly hoping that the credit market improves between now and the time it must write a cheque to shareholders at Casey's."  (Andrew Willis, <u>Bad Timing for Couche-Tard's Hostile Bid</u>, The Globe and Mail, June 4, 2010, at B12 (Earnhardt Decl. Ex. T).)

At any higher price, Couche-Tard might have to issue substantial amounts of new

equity just to fund the deal, which would undermine the benefits of an acquisition.

> "According to [Desjardins Securities Analyst Martin] Landry, if Couche-Tard has to raise its offer, and given its already high leverage, there is a likelihood the firm will need to issue more stock.  That could dampen the potential value that would accrue to shareholders."  (Peter Hadekel, <u>Will Couche-Tard Raise Its Bid?; First offer for Casey's Is Rejected</u>, The Gazette, Apr. 14, 2010, at B1 (Earnhardt Decl. Ex. N).)

Couche-Tard's rating agencies have confirmed Couche-Tard's dilemma even at

the current low ball price.

> "Alimentation [Couche-Tard] Inc.'s credit rating has been placed under review by Moody's Investor Services [sic] after the convenience store's hostile bid for Casey's General Stores Inc. . . . The Moody's review will focus on Couche Tard's plans to finance the potential transaction, including an assessment of its resulting balance sheet, liquidity profile and plans for future debt reduction."  (David Pett, <u>Moody's Puts Couche-Tard Under Review for Downgrade on News of Casey's Bid</u>, Nat'l Post's Fin. Post & FP Investing, Apr. 14, 2010, at FP9 (Earnhardt Decl. Ex. P).)

Couche-Tard is limited in what it can afford to pay.  Yet, its investors are

demanding an immediate, large scale acquisition.  These factors explain the motivation behind

Couche-Tard's scheme to manipulate Casey's stock price down to an affordable level.  Put

simply, Couche-Tard realized that for its tender offer to have any chance of success, it had to

artificially deflate Casey's stock price after it made its tender offer announcement.[1]

**F.      Couche-Tard Reaps Illicit Profits and Artificially Depresses the Value of Casey's Stock By Dumping Nearly Two Million Casey's Shares Into the Market Immediately After Announcing Its Intent to Make Its Low Ball Tender Offer to Casey's Shareholders.**

As described above, by April 8, 2010, Couche-Tard had acquired nearly <u>two million</u> Casey's shares at prices ranging from around $29 to $33 per share.  Casey's shares, which are traded on the NASDAQ Stock Market (the "NASDAQ"), closed at $31.59 on April 8, 2010.  (Casey's Trading History (Earnhardt Decl Ex. Y).)

Before the market opened on April 9, 2010, Couche-Tard publicly announced that it had "submitted a proposal to the Board of Directors of Casey's General Stores . . . to acquire all of the outstanding shares of common stock of Casey's for $36.00 per share in cash".  (4/9/10 Couche-Tard TO-C (Earnhardt Decl. Ex. D) at Press Release.)  Couche-Tard also announced that "if [Casey's Board] continue[s] to refuse to engage in meaningful negotiations, we are prepared to submit our proposal directly to [Casey's] shareholders [<u>i.e.</u>, to commence a tender offer] and commence a proxy contest to replace [Casey's] Board of Directors".  (<u>Id.</u>)  Couche-Tard filed its press release under Schedule TO-C.  (<u>Id.</u>)  The Announcement did not disclose that Couche-Tard owned two million shares of Casey's stock, much less that it planned to sell those shares.

---

[1] Indeed, even at the low ball price of $36 per share, there is significant risk that Couche-Tard will not be able to complete the acquisition.  Couche-Tard still has no committed financing. Couche-Tard has merely indicated that it plans on obtaining the necessary funds from a combination of cash on hand, borrowings under existing credit facilities and new financings that it will seek to obtain.  Couche-Tard has stated that it currently has only $138.3 million of cash on hand and $501.5 million available under existing credit agreements.  Assuming none of this cash or credit agreement capacity is required to run the Couche-Tard business, that still leaves approximately $1.3 billion (or 68%) of Couche-Tard's estimated $1.9 billion of financing needs in question.  If adequate financing is not arranged, Couche-Tard will not be able to pay even the patently inadequate offer price.  Couche-Tard has explicitly acknowledged that the risk associated with this financing condition is significant as it has stated in its offer to purchase, "We cannot guarantee that Alimentation Couche-Tard will be able to obtain the financings necessary to satisfy the financing condition to the consummation of the offer, particularly in light of the current economic conditions in the U.S. and Canada."  (Couche-Tard Schedule TO (Earnhardt Decl. Ex. R) at Summary Term Sheet at iv.)

In response to Couche-Tard's Announcement, and as Couche-Tard had intended, Casey's stock price opened much higher on April 9 than it closed on April 8.  Indeed, Casey's stock price jumped from $31.59 per share to $38.13 per share at the opening on April 9, a 21% increase over the prior day's closing price.  (Casey's Trading History (Earnhardt Decl. Ex. Y).)  Immediately after the Announcement, Couche-Tard dumped virtually all of its shares into the market at $38.43 per share.  (Couche-Tard Schedule TO (Earnhardt Decl. Ex. R) at 31.)  Couche-Tard netted nearly $14 million in profit from that sale.  (John Jannarone, <u>Heard on the Street: Alimentation's Marriage of Convenience</u>, Dow Jones NewsService, June 8, 2010 (Earnhardt Decl. Ex. W).)  Nearly two months later, Couche-Tard revealed for the first time that it had sold its Casey's stock on April 9, 2010 "in **<u>an</u>** open market sale" "at **<u>a</u>** price of $38.43 per Share".  (Couche-Tard Schedule TO (Earnhardt Decl. Ex. R) at 31.)

The intra-day trading history shows that Couche-Tard must have dumped its Casey's stock during the first hour of trading.  That was the only time during the day in which Casey's shares could have traded in the market at Couche-Tard's $38.43 price:

GRAB                                                          Equity**GIT**

| 11:35 | **INTRA−DAY PRICE INTERVALS** | | | | | Page 1 /2 | |
|---|---|---|---|---|---|---|---|
| CASEY'S GENERAL STORES I (CASY | | | US) | PRICE 35.85 | | P | $ DELAYED |
| Date | 4/ 9 | | | Interval Size (Minutes) | | 15 | USD |
| Time Interval | Close | NetChg | Open | High | Low | Tick | Volume |
| | 39.10 | + 7.51 | 38.13 | 39.37 | 37.90 | 34825 | 11584213 |
| 09:30 − 09:45 | 38.75 | + 7.16 | 38.13 | 38.99 | 37.90 | 7765 | 2808443 |
| 09:45 − 10:00 | 38.41 | − .34 | 38.78 | 38.85 | 38.34 | 4543 | 1322535 |
| 10:00 − 10:15 | 38.57 | + .16 | 38.40 | 38.59 | 38.39 | 2149 | 824123 |
| 10:15 − 10:30 | 38.51 | − .06 | 38.565 | 38.565 | 38.40 | 1544 | 1048537 |
| 10:30 − 10:45 | 38.52 | + .01 | 38.51 | 38.58 | 38.50 | 1728 | 1003383 |
| 10:45 − 11:00 | 38.51 | − .01 | 38.535 | 38.56 | 38.50 | 1386 | 946335 |
| 11:00 − 11:15 | 38.96 | + .45 | 38.5125 | 38.98 | 38.51 | 1331 | 468158 |
| 11:15 − 11:30 | 38.99 | + .03 | 38.94 | 39.21 | 38.83 | 926 | 306861 |
| 11:30 − 11:45 | 39.09 | + .10 | 39.00 | 39.09 | 38.86 | 673 | 140456 |
| 11:45 − 12:00 | 39.00 | − .09 | 39.09 | 39.09 | 38.97 | 757 | 227848 |
| 12:00 − 12:15 | 39.01 | + .01 | 38.99 | 39.03 | 38.98 | 701 | 221099 |
| 12:15 − 12:30 | 39.035 | + .025 | 39.005 | 39.14 | 39.00 | 568 | 179398 |
| 12:30 − 12:45 | 39.005 | − .03 | 39.045 | 39.06 | 38.93 | 632 | 122375 |
| 12:45 − 13:00 | 39.01 | + .005 | 39.01 | 39.09 | 38.99 | 307 | 46201 |
| 13:00 − 13:15 | 39.062 | + .052 | 39.01 | 39.088 | 39.01 | 383 | 47032 |
| 13:15 − 13:30 | 39.05 | − .012 | 39.08 | 39.13 | 39.01 | 340 | 51624 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2010 Bloomberg Finance L.P.
SN 102915 H192-971-0 10-Jun-10 11:35:06

GRAB                                                          Equity**GIT**

| 11:36 | **INTRA−DAY PRICE INTERVALS** | | | | | Page 2 /2 | |
|---|---|---|---|---|---|---|---|
| CASEY'S GENERAL STORES I (CASY | | | US) | PRICE 35.83 | | P | $ DELAYED |
| Date | 4/ 9 | | | Interval Size (Minutes) | | 15 | USD |
| Time Interval | Close | NetChg | Open | High | Low | Tick | Volume |
| | 39.10 | + 7.51 | 38.13 | 39.37 | 37.90 | 34825 | 11584213 |
| 13:30 − 13:45 | 39.09 | + .04 | 39.05 | 39.14 | 39.05 | 293 | 35844 |
| 13:45 − 14:00 | 39.14 | + .05 | 39.085 | 39.16 | 39.05 | 454 | 64273 |
| 14:00 − 14:15 | 39.305 | + .165 | 39.131 | 39.37 | 39.07 | 962 | 169327 |
| 14:15 − 14:30 | 39.07 | − .235 | 39.31 | 39.34 | 38.96 | 1266 | 263614 |
| 14:30 − 14:45 | 39.19 | + .12 | 39.07 | 39.21 | 39.05 | 665 | 132893 |
| 14:45 − 15:00 | 39.08 | − .11 | 39.195 | 39.21 | 39.02 | 787 | 190186 |
| 15:00 − 15:15 | 39.05 | − .03 | 39.08 | 39.11 | 39.02 | 988 | 192997 |
| 15:15 − 15:30 | 39.06 | + .01 | 39.05 | 39.10 | 39.00 | 988 | 202439 |
| 15:30 − 15:45 | 39.0605 | +.0005 | 39.06 | 39.14 | 39.05 | 1024 | 232257 |
| 15:45 − 16:00 | 39.10 | +.0395 | 39.06 | 39.16 | 39.05 | 1665 | 335975 |
| 16:00 − 16:15 | | | | | | | |
| 16:15 − 16:30 | | | | | | | |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900     Singapore 65 6212 1000     U.S. 1 212 318 2000     Copyright 2010 Bloomberg Finance L.P.
SN 102915 H192-971-0 10-Jun-10 11:36:10

(Intraday Price Intervals for Casey's General Stores, Inc. on Apr. 9, 2010, Bloomberg Finance L.P., as of June 10, 2010 (Earnhardt Decl. Ex. E).)

This trading activity further confirms that Couche-Tard intended its Announcement to manipulate Casey's stock price.  It strains credulity to suggest that Couche-Tard could have orchestrated a sale of nearly two million shares within one hour, and perhaps as early as within the first fifteen minutes, of the opening without having planned to do so in advance.  Couche-Tard's sale represented <u>17% of the total trading volume</u> during market hours on April 9.  Couche-Tard's behavior must have been premeditated:  Couche-Tard intended its Announcement to cause Casey's stock price to jump and it prepared to capitalize on that jump by arranging to dump its shares immediately after the opening bell.  There is no doubt that Couche-Tard intended its Announcement to manipulate Casey's stock price.

## G.   Couche-Tard's Market Manipulation Prevents Casey's Stock From Reaching Its Full Value.

In addition to reaping illicit profits, Couche-Tard also benefited by announcing its $36 tender offer – a low ball offer that it knows has no chance of succeeding under non-manipulated market conditions – immediately before dumping its stock.  In essence, the massive sale, undisclosed in the Announcement of the low ball offer, prevented Casey's stock from gaining as much as it would have under normal, efficient market conditions, <u>i.e.,</u> Couche-Tard's massive sale artificially depressed Casey's post-Announcement stock price.  That artificial depression has caused Couche-Tard's current $36 per share offer – made on June 2, 2010 – to appear more viable than it actually is.

Numerous industry commentators – unaware of Couche-Tard's massive stock dump – made clear that they expected the true value of Casey's stock to be greater than the $39 per share price it ultimately reached.

"'I don't know if they will go [as] high [as $44] because <u>obviously they're trying to make a very discounted acquisition</u>,' [Ben Brownlow, a Casey's analysts with

Morgan, Keegan, and Co.] said in an interview from Tennessee.  Brownlow said the Montreal-area retailer is trying to take advantage of a depressed industry by targeting a profitable chain with very loyal customers that could be added to its existing network of 400 stores in the U.S. Midwest."  (Casey's General Stores Rejects Couche-Tard's US$1.8B Hostile Takeover Bid, Waterloo Chron., Apr. 9, 2010 at 01 (Earnhardt Decl. Ex. G).)

"Brent Rystrom, an analyst at Feltl and Co. in Minneapolis, Minnesota, said Couche-Tard would have to sweeten its offer substantially if it wants to compete with private equity players.  'We believe it is likely Casey's could find a private equity buyer in this range,' he wrote in a note.  'Alimentation might have to make an offer in excess of $41 to actually close a deal.'"  (Scott Anderson, UPDATE 4-Casey's rejects Couche-Tard's $1.85 Bln Bid, Reuters News, Apr. 9, 2010 (Earnhardt Decl. Ex. F).)

". . . Michael Smith, a Casey's analyst with Kansas City Capital, said he believes Couche-Tard will have to boost its bid to at least $40. . . . Smith said he's not sure the Iowa company's shareholders are going to be pushed into accepting top dollar today rather than just letting its stock appreciate over time.  'I don't think it's a big enough bid to make shareholders give a (hoot),' he said in an interview." (Ross Marowits, Couche-Tard Seeks Stores, Waterloo Region Rec., April 10, 2010 at D3 (Earnhardt Decl. Ex. K).)

"Todd Vingers, a portfolio manager with Boston-based Lee Munder Capital Group, which holds shares in Casey's, said the deal does not make sense at US$36 a share.  'Seems like a lowball offer, so I'm not sure if their strategy is to play the negotiation game and pay a higher price later on, or if they're just throwing this out there to see if Casey's will bite,' he said in a telephone interview.  'If a higher price comes in I do think Casey's will consider it more seriously, but US$36 is not going to do it.'"  (Eric Lam, Couche-Tard Hostile Casey's Bid Rejected; 'On the Cheap', Nat'l Post's Fin. Post & FP Investing, April 10, 2010, at FP4 (Earnhardt Decl. Ex. I).)

"So how much might Couche-Tard or another bidder have to offer to get the deal done?
[National Bank Financial analyst James] Durran:  As much as $41 a share.
[Desjardins Securities analyst Martin] Landry:  Conservatively, $39.
[TD Newcrest analyst Michael] Van Aelst:  At least $40.
[Feltl & Co. analyst Brent] Rystrom:  $38.50 to $41."  (Steve Holtz, Exposing a Vulnerability, Who Else Could Buy Casey's General Stores And How Much Would It Cost?, CSP Daily News, Apr. 14, 2010 (Earnhardt Decl. Ex. O).)

"Justin Akin with Kentucky based [sic] River Road Asset Management, which managed a portfolio holding 5% of Casey's as late as the end of March, said the offer was 'lowball' and there was no reason to negotiate. . . . [Karin Short, analyst with BMO Capital Markets] estimated the real estate portfolio was worth about US$800 million.  'I don't think it's even worthwhile for the board to discuss at US$36,' [Mr. Brownlow] said.  'I think US$43 or US$44 is where you might get negotiations going.'"  (Eric Lam, Bid For Casey's Directed To Shareholders;

US$1.9B Offer; Couche-Tard's Hostile Offer Set At US$36 A Share, Nat'l Post's
Fin. Post & FP Investing, June 3, 2010, at FP5 (Earnhardt Decl. Ex. S).)

Thus, while sophisticated investors and analysts immediately recognized that
Couche-Tard's $36 per share offer is hopelessly low, Couche-Tard prevented the market price
from fully reflecting that information by dumping its millions of Casey's shares into its own
offer, thereby putting its thumb on the scale and preventing the market from functioning
normally (or efficiently).  In other words, Casey's stock price did not reflect the $40 - $44 dollar
valuation range expressed by analysts precisely because Couche-Tard's undisclosed massive sale
prevented the market from functioning as it normally would.  (Jeffrey Goldfarb, N.Y. Times A
Bid to Buy and Sell, June 15, 2010, at B2 (Earnhardt Decl. Ex. X) ("[Couche-Tard's] trading
must surely have influenced Casey's share price.  Peddling what amounted to some 17 percent of
Casey's daily trading volume as the market digested the hostile offer could well have restrained
the heights the shares might have otherwise reached as investors anticipated a deal at a higher
price.").)  Absent Couche-Tard's manipulation, Casey's stock price would have reflected the true
value of Casey's shares – a price substantially over $40 a share.  Casey's stock closed on
Thursday, June 10, at $35.71.  (Casey's Trading History (Earnhardt Decl. Ex. Y).)

**H.      Casey's Rejects the April 9 Offer and Couche-Tard Commences Its Tender
         Offer.**

On April 9, Mr. Myers wrote to Mr. Bouchard, and Casey's issued a press release
that described the Board's decision to reject Couche-Tard's proposal.  (Casey's June 8, 2010
Form 14D-9 (Earnhardt Decl. Ex. V) at 14.)  On June 2, 2010, Couche-Tard commenced its
tender offer by filing its Schedule TO with the SEC.  (Couche-Tard Schedule TO (Earnhardt
Decl. Ex. R).)

## ARGUMENT

In determining whether to grant preliminary injunctive relief, courts in the Eighth Circuit consider four factors:  (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm or injury to the movant absent the injunction; (3) the balance between the harm to the movant and the harm that the injunction's issuance would inflict on other interested parties; and (4) the public interest.  See, e.g., Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction."  Baker Elec. Coop., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994) (internal quotations omitted).  Here, the factors unanimously favor preliminary injunctive relief.

## I.    CASEY'S HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

In evaluating whether Casey's has demonstrated a likelihood of success on the merits, the Court need "not decid[e] whether [Casey's] will ultimately win".  Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 371 (8th Cir. 1991) (internal quotations omitted); see also Monarch Prods., LLC v. Zephyr Grafix, Inc., No. 4:09CV02049 ERW, 2010 WL 1837711, at *2 (E.D. Mo. May 4, 2010) ("[I]t is important to note that the Court is not deciding whether Plaintiffs will ultimately prevail in this case.") (vacated in part on other grounds).  Indeed, there is no requirement that Casey's demonstrate even a fifty percent chance of prevailing at trial. Dataphase, 640 F.2d at 113; Baker Elec., 28 F.3d at 1474 (reinstating preliminary injunction even where movant had not shown that it was more likely than defendant to win at trial). Instead, the "likelihood of success on the merits" factor will support injunctive relief so long as Casey's "find[s] support for its position in governing law" and produces evidence "sufficiently likely to support the kind of relief it requests".  Curtis 1000, Inc. v. Youngblade, 878 F. Supp. 1224, 1246-47 (N.D. Iowa 1995) (internal quotations omitted); see also B & D Land and

Livestock Co. v. Conner, 534 F. Supp. 2d 891, 906 (N.D. Iowa 2008); Uncle B's Bakery, Inc. v.

O'Rourke, 920 F. Supp. 1405, 1423-24 (N.D. Iowa 1996).  Casey's easily satisfies those

requirements for each of its claims.

> **A.      Casey's Is Likely to Prevail on its Section 10(b) and Rule 10b-5 Claims.**

To prevail on its Section 10(b) and Rule 10b-5 market manipulation claims,

Casey's must show:  (1) manipulative acts; (2) damage caused by reliance on an assumption of

an efficient market free of manipulation;[2] (3) scienter; (4) in connection with the purchase or sale

of securities; (5) furthered by Couche-Tard's use of the mails or any facility of a national

securities exchange.  See, e.g., In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 385

(S.D.N.Y. 2003); Cowen & Co. v. Merriam, 745 F. Supp. 925, 929 (S.D.N.Y. 1990).[3]  Even

without the benefit of discovery, the evidence supports each of those elements.

First, Couche-Tard engaged in "manipulative acts" within the meaning of the

statute.  Manipulative acts are "transactions in the securities marketplace, the effects of which

were to prevent the market price from accurately reflecting the market's unimpeded judgment of

the stock's value".  In re Charter Comm., Inc. Sec. Litig., 443 F.3d 987, 992 n.2 (8th Cir. 2006)

(citation and quotation omitted).  The Supreme Court has made clear that the term should be

interpreted broadly.  See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477 (1977) ("No doubt

---

[2] Because Casey's seeks only injunctive relief, it is unclear whether it even needs to show reliance.  See SEC v. Rana Research, Inc., 8 F.3d 1358, 1363-64 (9th Cir. 1993) (observing that the "bulk of cases requiring proof of reliance as an element of a Rule 10b-5 violation expressly qualify this holding to actions brought by private plaintiffs seeking damages"; as to claims for injunctive relief brought by the SEC, "reliance is not an element of a Rule 10b-5 violation by misrepresentation; rather, it is an element of a private cause of action for damages").

[3] Unlike disclosure claims, there is no requirement of a fiduciary relationship between the transaction participants.  See, e.g., Corsair Capital Partners, L.P. v. Wedbush Morgan Sec., Inc., No. CV-99-04670-ER, 2001 WL 1631487, at *2 (9th Cir. Dec. 19, 2001) ("[A] market manipulator cannot hide behind the lack of a relationship with his victims; market manipulation carries with it liability under Rule 10b-5(a) and (c), separate from the omissions liability."); United States v. Russo, 74 F.3d 1383, 1391-92 (2d Cir. 1996) (no fiduciary or other similar relation is required to be liable for market manipulation).

Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices."); see also United States v. Royer, 549 F.3d 886, 900 (2d Cir. 2008) (The "broad language, on its face, extends to manipulation of all kinds, whether by making false statements or otherwise").  Even a bona fide stock sale can run afoul of Rule 10b-5 if the seller intends for it to manipulate the market price or deceive investors.  Markowski v. SEC, 274 F.3d 525, 528-29 (D.C. Cir. 2001) ("[M]anipulation can be illegal solely because of the actor's purpose.").

Couche-Tard engaged in manipulative acts by anonymously dumping nearly two million shares of Casey's stock into the market immediately following the Announcement of its own tender offer.  That anonymous dump, which has "baffled more than a few on Wall Street" and was recently described by one commentator as "schizophren[ic]" and "perhaps too clever"[4], had the effect of "prevent[ing] the market price from accurately reflecting the market's unimpeded judgment of [Casey's] stock's value".  In re Charter Commc'ns., 443 F.3d at 992 n.2.  Casey's shareholders were deceived into believing (then and now) that Casey's stock price reflected an arm's-length assessment of Casey's intrinsic value by unbiased investors.  The undisclosed truth is that Couche-Tard's massive sale manipulated the market, setting an artificial ceiling on the post-Announcement run up of the price of Casey's shares.  That artificial depression has made Couche-Tard's Offer Price appear more viable than it actually is.

Such conduct is undoubtedly a "manipulative act" proscribed by Rule 10b-5.  See, e.g., Royer, 549 F.3d at 900 (finding manipulative acts where "defendants sought to artificially affect the prices of various securities by directing [others] to trade . . . at times and in manners orchestrated by the defendants that were dictated not by market forces, but by defendants' desire

---

[4] Jeffrey Goldfarb, Breakingviews - Hostile Bid Schizophrenia Rightly Raises Eyebrows, Reuters News, June 14, 2010 (Earnhardt Decl. Ex. AA), republished in the June 15, 2010 edition of the New York Times as A Bid to Buy and Sell (Earnhardt Decl. Ex. X).

to manipulate the market for their own benefit"); <u>Crane Co. v. Westinghouse Air Brake Co.</u>, 419

F.2d 787, 795 (2d Cir. 1969) (finding market manipulation where defendant sought to defeat a

competing tender offer by "conceal[ing] from the public its own secret sales off the market at the

same time it was dominating trading in [the target corporation's] shares at a price level

calculated to deter [the target's] shareholders from tendering to [the competing offeror]"); <u>United</u>

<u>States v. Charnay</u>, 537 F.2d 341, 344 (9th Cir. 1976) (defendants committed manipulative acts

by artificially depressing stock prices to facilitate takeover bid by convincing others to sell

86,100 shares short in the market).

      <u>Second</u>, Couche-Tard's manipulative acts have harmed and continue to harm

Casey's and its shareholders because those constituencies relied on the presumption of an

unmanipulated and efficient market. Casey's is entitled to have its market value determined

solely by market forces.  <u>Cf.</u> <u>Hevesi v. Citigroup Inc.</u>, 366 F.3d 70, 77 (2d Cir. 2004) (explaining

that market prices of securities are presumed to reflect intrinsic value of securities).  However,

due to Couche-Tard's manipulation, Casey's stock price is artificially depressed, the Company

remains the target of an inadequate tender offer and the tender offer has been made to appear

more reasonable to investors than it actually is.  (<u>See</u> <u>supra</u> § G.)  As a result of the manipulation,

Casey's has a lower market capitalization than it otherwise would have, its strategic options have

been limited and it has been forced to deal with increased uncertainty and with investors and

financial markets confused by its artificially dampened share price.  In essence, Casey's is being

held hostage by Couche-Tard's manipulation of its stock price.  <u>Cf.</u> <u>Elec. Specialty Co. v. Int'l</u>

<u>Controls Corp.</u>, 409 F.2d 937, 946 (2d Cir. 1969) (artificial depression of stock price in

connection with tender offer may "harm the target corporation if it should wish to engage in

financing or acquisitions, and a still different potential for harm to the corporation will exist

where it is claimed that the offeror has evil designs on its treasury or business plans").

Likewise, Casey's shareholders have sold – and, absent injunctive relief, will continue to sell – shares of Casey's stock at prices that have been artificially depressed by Couche-Tard.  (See supra § G.)  A Dow Jones News reporter described the situation aptly:  "The question is whether Couche-Tard should be allowed to get a free hedge at the expense of other investors. . . ."  (John Jannarone, Heard on the Street:  Alimentation's Marriage of Convenience, Dow Jones NewsService, June 8, 2010 (Earnhardt Decl. Ex. W).)  The law says it cannot.  Crane, 419 F.2d at 794 ("[Rule 10b-5] seeks to give investors markets where prices may be established by the free and honest balancing of investment demand with investment supply.").

Third, Couche-Tard acted with scienter.  "Scienter is the 'mental state embracing intent to deceive, manipulate, or defraud.'"  Pagel, Inc. v. SEC, 803 F.2d 942, 946 (8th Cir. 1986) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976)).  "Proof of scienter need not be direct but may be 'a matter of inference from circumstantial evidence.'"  Pagel, 803 F.2d at 946 (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 390 n.30 (1983)).  Scienter may be shown by "establishing a motive to commit [the unlawful act] and an opportunity to do so".  In re Eng'g Animation Sec. Litig., 110 F. Supp. 2d 1183, 1191 (S.D. Iowa 2000) (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 269 (2d Cir. 1993)); Schuster v. Anderson, 413 F. Supp. 2d 983, 1011 (N.D. Iowa 2005).  Indeed, "[w]hen a person who has a substantial, direct pecuniary interest in the success of a proposed [tender] offering takes active steps to effect a [change] in the market in the security, . . . a finding of manipulative purpose is prima facie established."  Crane, 419 F.2d at 795.

While the full extent and precise details of Couche-Tard's intent cannot be confirmed until Casey's is given an opportunity to conduct discovery, the facts already uncovered demonstrate that Couche-Tard acted with scienter.  Couche-Tard was desperate to purchase a large, valuable company like Casey's.  However, Couche-Tard's financial situation

and the condition of the markets limited the amount Couche-Tard was able to spend.  As a result, Couche-Tard had an "unusual and heightened" motive to depress Casey's stock price.  Couche-Tard also manufactured the "opportunity to effectuate that motive".  It did so by:  (i) secretly acquiring nearly two million shares of Casey's stock before announcing its tender offer; (ii) announcing its intention to make a tender offer without disclosing either its holdings or its intention to dump them moments later; and (iii) immediately dumping its two million shares into an unsuspecting marketplace.

The speed at which Couche-Tard made its massive sale is further evidence of its intent.  Based on the pricing of the shares traded that day, the trading data indicate that Couche-Tard sold its almost two million shares within the first hour of the opening bell.  That sale was 17% of the trading volume for the entire day.  Couche-Tard could not have made such a large sale on the spur of the moment.  The size and swiftness of Couche-Tard's sale reveals the premeditated nature of its acts.

Fourth, Couche-Tard's actions were taken in connection with the purchase and sale of securities.  As part of its scheme, Couche-Tard bought and sold nearly two million shares of Casey's stock for proceeds of over $75 million.  See SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1993) ("[T]he in connection with requirement is met if the [unlawful conduct] alleged somehow touches upon or has some nexus with any securities transaction.").

Fifth, Couche-Tard used the mails and the facilities of the NASDAQ and/or other securities markets to carry out its scheme.  See SEC v. Softpoint, Inc., 958 F. Supp. 846, 865 (S.D.N.Y. 1997) (jurisdiction element satisfied where defendant's "press releases and public filings were conveyed by mail or wire" and by the fact that plaintiff sold its shares while the affected stock was trading on the Boston Stock Exchange).

Thus, as to each element of its market manipulation claim, Casey's has strong

"support for its position in governing law" and, even at this early stage, has produced evidence "sufficiently likely to support" the requested relief.  Curtis 1000, 878 F. Supp. at 1246-47.  That is, Casey's has shown a likelihood of success on the merits.

      **B.**      **Casey's Is Likely to Prevail on its Section 14(e) Claim.**

      Casey's also is likely to prevail on its Section 14(e) claim.  To prevail on its Section 14(e) claim, Casey's must show:  (1) that Couche-Tard made an untrue statement of fact or omitted to state a fact necessary to make statements made not misleading; (2) in connection with a tender offer; (3) with scienter; and (4) that the misstatement or omission was material.  See, e.g., Chris-Craft Ind., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 365 (2d Cir. 1973).  Casey's claim satisfies each of those elements.

      First, as explained above, Couche-Tard's failure to disclose its Casey's holdings – and its plan to dump those holdings back into the market immediately after the Announcement – made the Announcement misleading.  (See supra § F.)  Indeed, Couche-Tard did not disclose any of the salient facts for nearly two months, and still has not disclosed the full extent of its scheme to Casey's investors.  See In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d at 381-82 ("[P]articipants in the securities markets are entitled to presume that all of the actors are behaving legally; silence that conceals illegal activity is therefore intrinsically misleading . . . .").

      Second, Couche-Tard's misleading Announcement was made "in connection with a tender offer".  Couche-Tard's Announcement unquestionably qualifies as "in connection with a tender offer" because Couche-Tard filed it with the SEC under Schedule TO-C and literally "checked the box" indicating that "the filing relates solely to preliminary communications made before the commencement of a tender offer . . . subject to Rule 14d-1".  (4/9/10 Couche-Tard TO-C (Earnhardt Decl Ex. D).)  See Gas Natural v. E.ON AG, 468 F. Supp. 2d 595, 613 (S.D.N.Y. 2006) ("[P]re-commencement communications conveyed through a Schedule TO-C

are 'in connection with' a tender offer, and Section 14(e)'s prohibitions apply to such communications."). Section 14(e) does not require the actual commencement of a tender offer. Hanna Mining Co. v. Norcen Energy Res. Ltd., 574 F. Supp. 1172, 1200 (N.D. Ohio 1982) (noting that were it otherwise, "numerous misstatements, omissions and half-truths could be promulgated with relative impunity until the offer was actually filed with and approved by the SEC") (citations omitted); Lewis v. McGraw, 495 F. Supp. 27, 30 (S.D.N.Y. 1979) ("Plaintiffs have alleged statements and actions by defendants which clearly would have had the capacity to affect any future decision by stockholders in a tender offer [and thus 14(e) applies].") Instead, Section 14(e) will apply so long as "the prospective offeror has made a public announcement of a proposed tender offer and has established a clear and definite intent to make a tender offer". Lewis, 495 F. Supp. at 30.

Third, Couche-Tard acted with scienter. As described above, Couche-Tard intended to manipulate Casey's share price by making the misleading Announcement. (See supra § E, F.) Couche-Tard was under extreme pressure to close a major acquisition and it used the Announcement and its stock dumping scheme to make its low ball offer appear more plausible, while simultaneously reaping illicit profits. The only way for Couche-Tard to achieve its manipulative objectives was to make the Announcement without disclosing its pump and dump scheme – i.e., by omitting material facts needed to make the Announcement not misleading.

Fourth, Couche-Tard's omissions are material. A reasonable investor, in deciding how to invest, would have considered it important that Couche-Tard intended to implement a pump and dump scheme and to artificially depress the price of Casey's stock. Couche-Tard's failure to disclose its substantial stock holdings, its plan to sell those holdings and its intent to manipulate Casey's stock price to its own advantage altered the total mix of information that

should have been available to Casey's shareholders who bought or sold shares of Casey's stock on April 9, 2010, and that should now be available to Casey's shareholders who are deciding whether to tender their shares.  See United States v. Regan, 937 F.2d 823, 829 (2d Cir. 1991) ("Failure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of material fact.") (citations omitted); Chris-Craft, 480 F.2d at 365 (finding a material omission in violation of section 14(e) where defendant "fail[ed] to disclose with substantial accuracy a transaction which was likely to affect the attitude of [its] shareholders toward the . . . tender offer"); see also Life Investors, Inc. v. Ago Holding, N.V., No. 81-2065, 1981 WL 15483, at *1 (8th Cir. 1981) (omitted fact is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available") (citations omitted).[5]

Under these circumstances, an injunction barring consummation of the tender offer is appropriate.  See Clearfield Bank & Trust Co. v. Omega Fin. Corp., 65 F. Supp. 2d 325, 346-47 (W.D. Pa. 1999) (according injunctive relief for material omissions in violation of section 14(e)); Hanna Mining Co., 574 F. Supp. at 1202-03 (same).

### C.    Casey's Is Likely to Prevail on its Rule 14e-8 Claim.

"With the specific goal of discouraging fraud in the context of pre-[tender offer] commencement communications, the SEC promulgated Rule 14e-8" in 1999.  Gas Natural, 468 F. Supp. 2d at 609.  Rule 14e-8 was promulgated based on the SEC's authority pursuant to Section 14(e) to "define, and prescribe means reasonably designed to prevent such acts and practices as are fraudulent, deceptive, or manipulative."  15 U.S.C. § 78n(e) (2002).

It provides, inter alia, that

---

[5] Because Couche-Tard's omissions were material, reliance is presumed.  Chris-Craft Ind., 480 F.2d at 374-75.

> "It is a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the Act for any person to publicly announce that the person (or a party on whose behalf the person is acting) plans to make a tender offer that has not yet been commenced, if the person: . . .
>
> (b) Intends, directly or indirectly, for the announcement to manipulate the market price of the stock of the bidder or subject company . . .".  17 C.F.R. § 240.14e-8 (1999).

Rule 14e-8(b) proscribes exactly the conduct at issue here.  On April 9, Couche-Tard announced a tender offer that "ha[d] not yet been commenced".  Id.  By making the Announcement without disclosing all of the material facts, Couche-Tard "intend[ed] directly or indirectly [ ] for the announcement to manipulate the market price of the stock of the . . . subject company".  Id.  Couche-Tard's intent is made clear by the fact that:  (i) it was able to sell nearly two million shares – at a profit of nearly $14 million dollars – within the first hour of trading; (ii) it did not disclose its plan to sell those shares before, during or after the Announcement on April 9; but instead (iii) waited nearly two months to disclose the salient facts.  Expedited discovery will likely provide further evidence of Couche-Tard's intent.  Even now, however, it is clear that Couche-Tard violated Rule 14e-8.

## II.   CASEY'S WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF.

Casey's can demonstrate irreparable harm "by showing that [it] has no adequate remedy at law".  B & D Land and Livestock Co. v. Conner, 534 F. Supp. 2d 891, 907 (N.D. Iowa 2008).  Irreparable harm will be found where, absent preliminary injunctive relief, there is a risk that Casey's will be denied complete redress for its injuries.  See, e.g., Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 371-72 (8th Cir. 1991) (finding irreparable harm where damages and permanent injunctive relief would not fully compensate plaintiff for its injuries); Ryko Mfg. Co. v. Eden Servs., 759 F.2d 671, 673 (8th Cir. 1985) (irreparable harm found where "money damages could not fully compensate [movant] for the loss of its business").

This case presents the quintessential situation where plaintiff will suffer irreparable harm absent preliminary injunctive relief.  Without an injunction, the tender offer could close and, as numerous courts have noted, "once the tender offer has been consummated it becomes difficult, and sometimes virtually impossible, for a court to 'unscramble the eggs'". Sonesta Int'l Hotels Corp. v. Wellington Assocs., 483 F.2d 247, 250 (2d Cir. 1973) (citing cases).  For this reason, courts have recognized in the context of tender offers that "preliminary injunctive relief is a particularly useful remedy for prevention of probable violations of the disclosure requirements of [the Exchange] Act, for the reason that prior to consummation of the offer the court still has a variety of methods available to it for correction of the misstatements or omissions."  Id.; see also Life Investors Inc., 1981 WL 15483, at *4 (finding irreparable harm in view of defendant's material omission in connection with its tender offer); Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc., 307 F. Supp. 910, 915 (S.D.N.Y. 1969) ("Those persons tendering shares . . . which are accepted will have committed an irrevocable act from which they will have little, if any, relief.  The consummation of the tender offer, if not enjoined, would seriously disrupt [plaintiff's] business, management and personnel, and further allow [defendant] to reap the fruits of its misrepresentations.").

Moreover, in egregious situations like the one presented here, courts have recognized that it is appropriate to enjoin the wrongdoer from closing the affected transaction until there can be a full trial on the merits.  USG Corp. v. Wagner & Brown, 690 F. Supp. 625, 627 (N.D. Ill. 1987) ("Filing a completely truthful Schedule 13D does not necessarily remedy the injuries suffered by shareholders who relied on [previous] misstatements or omissions . . . . The merits of this controversy may warrant further injunctive relief."); Champion Parts Rebuilders, Inc. v. Cormier Corp., 650 F. Supp. 87, 88-89 (N.D. Ill. 1986) (rejecting argument that "once a

wholly truthful Schedule 13D is of record, the issuer corporation's case is rendered moot" and

ordering hearing on preliminary injunction motion).

For example, in General Steel Industries, Inc. v. Walco National Corp., the court

held that corrective disclosure alone would not provide a sufficient remedy:

> "Because of the irreparable harm to [the target's] shareholders, both past and
> present, it is appropriate that [the acquiror] offer rescission to all [target]
> shareholders that sold in the open market during the period of its noncompliance
> and that the Offer be enjoined pending the completion of that process. . . .
> Additionally, an injunction pending rescission is appropriate to deter future
> violations of law and *to prohibit [the acquiror] from taking advantage of a*
> *position it has illegally obtained.*"   No. 81-1410-C, 1981 WL 17552, at *6 (E.D.
> Mo. Nov. 24, 1981) (citations omitted, emphasis added).

Similarly, in Hanna Mining Co. v. Norcen Energy Resources Ltd., the district court held that

"more than corrective disclosure is necessary" because

> "[a]ny different result would mean that an acquiring corporation could engage in
> the most deliberate form of misrepresentation in its statutory filings and when its
> fraud is discovered merely file corrective amendments and keep the benefits of its
> wrongful conduct regardless of how that conduct may continue to injure
> shareholders of the corporation whose stock it has acquired."  574 F. Supp. 1172,
> 1202-03 (N.D. Ohio 1982).[6]

So too here.  Couche-Tard's manipulative acts have prevented Casey's shareholders from

adequately valuing Casey's shares and, consequently, have cloaked Couche-Tard's current

tender offer with an air of legitimacy it does not deserve.  In this situation, Casey's and its

shareholders will suffer irreparable harm if the tender offer is allowed to close before Casey's

and the Court fully understand the extent (and price impact) of Couche-Tard's scheme.

---

[6] Cf. Fin. Gen. Bankshares, Inc. v. Lance, No. 78-0276, 1978 WL 1082, at *13 (D.D.C. Apr.
27, 1978) (holding that a group of defendants, "pending a trial on the merits, should be enjoined
from acquiring [the target's] stock or soliciting proxies until they have offered rescission to those
persons from whom they purchased [the target's] stock on the open market" as "these
shareholders, who sold their stock without knowledge that these purchasers were acquiring a
large block of [the target's] stock and were considering seeking control of [the target], will be
irreparably injured unless the defendants offer them rescission before the defendants obtain
control of [the target]").

**III.      THE BALANCE OF HARMS FAVORS PRELIMINARY INJUNCTIVE RELIEF.**

"[T]he balance of harms analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public." B & D Land, 534 F. Supp. 2d at 909.  The analysis requires that the Court look to "the threat to each parties' rights that would result from granting or denying the injunction".  Id. Where the movant "faces a real threat of harm from [the non-movant's actions] during the pendency of its action for judicial review. . . . there must be something significant on the other side of the scales for this factor to weigh against the issuance of an injunction."  Id.

Couche-Tard will not be wrongfully prejudiced if a preliminary injunction issues. It has long been recognized in the tender offer context that "when a plaintiff raises serious questions going to the merits, and relief can be fashioned which protects the public investor without significantly damaging the [defendant], such relief is fully warranted".  Broder v. Dane, 384 F. Supp. 1312, 1323 (S.D.N.Y. 1974).  By contrast, "if the injunction is wrongfully denied, the investing public and [Casey's] shareholders will suffer incalculable harm by being wrongfully denied information to which they are entitled and that is material to making informed investment decisions including whether to buy or sell [Casey's] stock."  Standard Fin., Inc. v. LaSalle/Kross Partners, L.P., No. 96 C 8037, 1997 WL 80946, *6 (N.D. Ill. Feb. 20, 1997).

Thus, courts have repeatedly issued preliminary injunctions enjoining tender offers until the shareholders are adequately apprised of all material facts necessary to permit them to make an informed judgment as to the advisability of tendering their shares.  Id.  As the court stated in Sonesta:

> "[P]reliminary relief does not, in assuring that the offer will be lawfully made, sacrifice the legitimate desires of shareholders to accept the offer.  If the offeror is subsequently vindicated after a trial on the merits, the offer may be renewed. Thus, in the normal situation, when it appears likely that the offer may contain materially misleading statements or omissions as made, the interest of the shareholders and of the public in full disclosure of relevant circumstances renders

preliminary injunctive relief an appropriate method of remedying the deficiencies in disclosure before the offer is consummated."  483 F.2d at 250-51.

The same logic applies here.  Casey's and its shareholders face irreparable harm if the tender offer closes before a trial on the merits.  Couche-Tard, on the other hand, faces only minimal delay.  If Couche-Tard is vindicated after trial, it can resume its tender offer and be no worse for the wear.  If, however, Couche-Tard is found liable, it should not be allowed to reap the benefits of its illicit scheme and would, therefore, have suffered no prejudice from the preliminary injunction.  In either event, the balance of harm favors a preliminary injunction.

## IV.   THE PUBLIC'S INTEREST FAVORS PRELIMINARY INJUNCTIVE RELIEF.

A preliminary injunction will have no adverse effect on the public interest. Indeed, a significant consideration in the public interest analysis is "the purposes and interests any underlying legislation was intended to serve" and whether such legislation expresses a preference for enjoining inequitable conduct.  B & D Land, 534 F. Supp. 2d at 910; see also Uncle B's Bakery, Inc. v. O'Rourke, 920 F. Supp. 1405, 1438 (N.D. Iowa 1996) (finding the public interest embodied and articulated in the legislative purpose of the relevant statute).

Consistent with the purpose and intent underlying Sections 10(b) and 14(e) of the Exchange Act, numerous courts have held there to be an overriding public interest in ensuring that stockholders receive full and accurate disclosure before a tender offer closes.  Otis Elevator Co. v. United Techs. Corp., 405 F. Supp. 960, 973 (S.D.N.Y. 1975) ("The Williams Act was designed to protect investors; and therefore the interests of the investing public must be paramount."); Standard Fin., 1997 WL 80946, at *7 ("The investing public may suffer incalculable harm regarding their ability to make informed investment decisions if an injunction is improperly denied."); Chambers v. Briggs & Stratton Corp., 863 F. Supp. 900, 906 (E.D. Wis. 1994) (granting preliminary injunction in part due to "overriding public interest in the full and accurate disclosure of information to shareholders of public corporations to ensure that a

shareholder's vote is based upon accurate, and complete information"); <u>Lewis v. Gen. Emp't.</u>

<u>Enters.</u>, No. 91 C 0291, 1991 WL 11383, at *4 (N.D. Ill. Jan. 21, 1991) ("Defendants cannot

dispute that the public interest favors absolute and full disclosure to ensure that a shareholder

vote be based upon complete, accurate and comprehensible information.").

### CONCLUSION

Casey's respectfully requests that this Court issue an order:

1. Directing Couche-Tard to make full and complete corrective disclosure to Casey's shareholders regarding its manipulative scheme to reap illicit profits and artificially depress the market price of Casey's stock;

2. Enjoining Couche-Tard from manipulating or attempting to manipulate the market price of Casey's stock;

3. Enjoining Couche-Tard and ACT from taking further steps to consummate the tender offer and from purchasing shares of Casey's until after a trial on the merits; and

4. Granting such other and further relief as the Court deems just and proper.

June 18, 2010

/s/ Edward W. Remsburg

Edward W. Remsburg (AT0006511)
AHLERS & COONEY, P.C.
100 Court Avenue, Suite 600
Des Moines, Iowa 50309-2231
Telephone:  515/243-7611
Facsimile:  515/243-2149
E-mail: eremsburg@ahlerslaw.com

Robert H. Baron
J. Wes Earnhardt
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1422
Facsimile:  (212) 474-3700
Email:  rbaron@cravath.com
        wearnhardt@cravath.com

Electronically filed.

Electronically served on all parties.

Copy via email to:

Jay Eaton
700 Walnut, Suite 1600
Des Moines, IA 50309-3899
Phone: (515) 283-3158
Fax: (515) 283-3108
je@nyemaster.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings, on <u>June 18, 2010.</u>

By      ☐ **U.S. Mail**          ☐ **Fax**

             ☐ **Hand Delivery**      ☐ **Private Carrier**

             ☒ **Electronically through CM-ECF / Email**

Signature  <u>/s/ Amanda G. Wachuta</u>