IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| CASEY'S GENERAL STORES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ALIMENTATION COUCHE-TARD, INC. and ACT ACQUISITION SUB, INC., <br><br> Defendants. | No. 4:10-cv-00265 <br><br><br> **ORDER** |

This matter comes before the Court pursuant to Plaintiff Casey's General Stores, Inc.'s ("Casey's") June 18, 2010 Motion for Preliminary Injunction. [Dkt. Nos. 8 & 14.] Defendants Alimentation Couche-Tard, Inc. and ACT Acquisition Sub, Inc. (collectively, "Couche-Tard"), filed a response and resistance, to which Casey's replied. [Dkt. Nos. 33, 34, 40.] The parties engaged in limited, accelerated discovery in preparation for a hearing on Casey's preliminary injunction motion, which was held on September 1, 2010. The parties also submitted a joint factual record[1] and accompanying comments on the factual record. [Dkt. Nos. 62–70.]

At issue is whether Couche-Tard intentionally failed to make material disclosures regarding its sale of Casey's stock on April 9, 2010, such that the Court should order Couche-Tard to amend certain SEC filings. After considering the parties' briefs, oral arguments, and exhibits, the Court makes the following findings of fact and conclusions of law and denies the motion.

---

[1]The Court refers to items in the "Joint Appendix" as "JX". For example, a citation to Joint Appendix No. 1 is cited as "JX 1".

## I. BACKGROUND

### A. Summary

Couche-Tard and Casey's both operate convenience stores throughout North America. Couche-Tard is a Canadian company that operates approximately 5900 stores in Canada and the United States. Casey's was founded in Iowa and operates 1513 stores throughout the Midwest. In late 2009, Couche-Tard management saw the opportunity to expand in the Midwest by acquiring Casey's in an all-cash tender offer. By April 9, 2010, Couche-Tard publicly announced its intention to acquire Casey's in a hostile takeover. That same morning, Couche-Tard sold almost two million Casey's shares it had acquired, for more than the $36.00 per share that it had announced in its tender offer. A formal tender offer to Casey's shareholders was filed with the Securities and Exchange Commission ("SEC") on June 2, 2010.

With this motion for preliminary injunction, Casey's seeks to order Couche-Tard's directors to make corrective disclosure to Casey's shareholders about its April 9, 2010 sale of Casey's stock.

### B. Negotiations Prior to Tender Offer Announcement

Couche-Tard's management determined in the Fall of 2009 that acquiring Casey's could result in a successful business combination. Casey's acquisition would provide rapid expansion in an area where Couche-Tard had limited market presence. Couche-Tard began buying Casey's stock on September 24, 2009 and made over forty subsequent purchases until April 8, 2010, acquiring a total of 1,975,362 shares (or 3.9 percent of total outstanding shares).[2] Couche-Tard bought shares priced from $29.862 to $32.496 per share. Couche-

---

[2]The acquisition of shares *before* the tender offer announcement is not in issue. Couche-Tard made these purchases in conformity with Section 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 13D promulgated thereunder. 15 U.S.C. §78m(d)(1), (g)(1) ("beneficial owner of *more than* 5 per centum" shall file a statement of its ownership with the SEC and the issuer of the security) (emphasis added), 17 C.F.R. § 240.13d-1(a). Section 14(e) of the Exchange Act and

Tard's objective in purchasing shares before announcing an offer—or engaging in negotiations leading to an offer—was to lower the weighted average price in anticipation of acquiring 100 percent of the outstanding shares.

The first overtures regarding acquisition of Casey's by Couche-Tard began on October 6, 2009. During a telephone conversation, Mr. Alain Bouchard, President and Chief Executive Officer ("CEO") of Couche-Tard, asked Mr. Robert J. Myers, President and CEO of Casey's, if Casey's would be interested in exploring a business combination. Mr. Myers orally rejected the proposal and stated that Casey's was not interested. Another telephone conversation occurred between Mr. Bouchard and Mr. Myers on November 16, 2009, in which Mr. Bouchard revisited the subject of Couche-Tard's interest in acquiring Casey's. Mr. Myers again rejected the idea and asked Mr. Bouchard to put any future offers in writing.

Mr. Bouchard sent Mr. Myers a letter on March 9, 2010. [Compl. ¶ 43, Dkt. No. 1.] This letter contained a non-binding proposal for Couche-Tard to acquire 100 percent of Casey's outstanding common shares at a cash offer of $36.00 per share. The offering price had been calculated by Couche-Tard's financial advisor, Crédit Suisse Securities (USA) L.L.C., and represented a 14 percent premium over the March 8, 2010 closing price, a 17 percent premium over Casey's 90-calendar day average closing price, a 20.1 percent premium over Casey's 30-calendar closing price, a 24 percent premium over Casey's one-year average closing price, and a 10.3 percent premium over Casey's record closing price of $32.65.

On March 23, 2010, Mr. Myers presented the letter to the Casey's Board of Directors ("Board") at a regularly scheduled meeting. The Board, members of senior management, Casey's legal advisors, and Casey's financial advisor, Goldman, Sachs & Co., all reviewed

---

Rule 14e-3 promulgated thereunder allows offering persons, owning less than 5 percent beneficial ownership of outstanding shares, to buy and sell shares prior to announcing a tender offer. 15 U.S.C. § 78n(d)(1), 17 C.F.R. § 240.14e-3(c).

the proposal. Two days later, on March 25, 2010, the Board unanimously voted to reject Couche-Tard's proposal stating that it was not in the best interests of the company. Mr. Myers conveyed the Board's decision to Mr. Bouchard in a letter dated March 29, 2010.[3]

On March 30, 2010, Mr. Bouchard renewed Couche-Tard's proposal to acquire Casey's pursuant to the same terms and conditions as the March 9, 2010 letter. [Compl. ¶ 48.] However, this letter also expressed Couche-Tard's intention to present the tender offer to shareholders "if you continue to be unwilling to engage in meaningful negotiations with us". Id. The letter set a deadline to respond by April 7, 2010. Id.

The Board met on April 5, 2010, and formally rejected Couche-Tard's offer on April 7, 2010. [Compl. ¶ 50.] The Board did not explain its rationale, except to state that "the Board takes its fiduciary duties very seriously and came to this conclusion after a thorough, thoughtful evaluation of the proposal in consultation with our advisors . . . . The Board firmly believes that the proposal is not in the best interests of the Company." Id.

### C. Tender Offer Announcement

On the morning of April 9, 2010, Mr. Bouchard informed Mr. Myers that Couche-Tard would issue a press release announcing its proposal to acquire all outstanding shares at $36.00 per share, in cash. Before the market opened, Mr. Bouchard sent a copy of the

---

[3]Addressed to Mr. Bouchard and signed by Mr. Myers, the letter stated:

> We received your letter dated March 9, 2010 outlining your unsolicited proposal to acquire Casey's General Stores, Inc. Our Board of Directors has thoroughly evaluated it in consultation with our financial and legal advisors, and has unanimously rejected your proposal.
>
> We recognize your high regard for our operations, management and employees. We agree with your observation that we have built a great brand at Casey's, and we are very excited about the opportunities to continue to grow our business.

[Compl. ¶ 46.]

letter to the Casey's Board, issued the letter as a press release, and filed the press release (Schedule TO-C) with the SEC. [JX 9 at 1.] The pertinent parts of the press release are below:

> As conveyed to you in our letters dated March 9, 2010 and March 30, 2010, our Board of Directors has authorized a proposal to acquire all of the outstanding shares of common stock of Casey's General Stores, Inc. ("Casey's") at a price of $36.00 per share in cash. Despite our repeated efforts starting in October 2009 to engage in negotiations, and without the benefit of discussing our proposal with us or our advisors, your Board of Directors unanimously rejected our proposal. Our goal remains to work with you to agree to a negotiated transaction. However, due to your unwillingness to engage in discussions and the unique opportunity presented by our proposal for your shareholders to realize full and immediate value, we are compelled to make this proposal known to your shareholders.
>
> . . .
>
> Our strong preference is to work with you to negotiate a mutually acceptable transaction and avoid unnecessary costs. . . . However, if you continue to refuse to engage in meaningful negotiations, we are prepared to submit our proposal directly to your shareholders and commence a proxy contest to replace your Board of Directors.

Id. at 2–3. In the letter, Couche-Tard announced its intention to make in a hostile tender offer if the Casey's Board refused to engage in discussions or negotiations. Nowhere in the tender offer announcement ("Announcement") did Couche-Tard state that it owned shares of Casey's, or that it intended to sell its Casey's shares if the market price rose above $36.00 per share.

The day before the Announcement, the stock price of Casey's closed at $31.59 per share. But, as a result of the Announcement, the stock opened on April 9, 2010 at $38.13 per share—more than $2.00 over the tender offer of $36.00 and a 21 percent increase over

the prior day's closing price. [JX 3 at 1.]  Before the market opened[4], but after the Announcement had been made public at 8:23 a.m., senior management at Couche-Tard made the observation that over two million shares had already been exchanged in pre-market trading at a price at or above $38.00 per share.  Realizing that profit could be made on the nearly two million shares of Casey's stock that Couche-Tard owned, Mr. Bouchard then authorized the sale of its Casey's toehold position.  The Chief Financial Officer ("CFO") and Vice President of Couche-Tard, Mr. Raymond Paré, called Couche-Tard's broker, Christopher Dale, at National Bank Financial at 9:21 a.m. and directed him to sell Casey's shares at any price above $36.00.  Portions of the conversation are recounted below:

| | |
|---|---|
| Raymond Paré: | What we would like to do, I heard that, already before the opening of the market, 2 million shares were exchanged, basically, and the price of our target, it's already at 38. |
| Christopher Dale: | Yep, yep. |
| Raymond Paré: | Could we start to sell some of our shares? And because we want to protect basically those gains to, because we don't know, it's still an unsolicited process, and I don't know where it will end up.  Could we start to sell and we try clearly don't have any idea or we don't have any.  We don't want to pay 38. |
| Christopher Dale: | Right, right. |
| Raymond Paré: | I heard that right now it's around 38. Could you start to sell some of our position? |
| Christopher Dale: | Ahh.  Okay, if that's what you want me to do.  I don't think there's anything that causes a problem from my side.  Is there any particular strategy you want to |

---

[4]Casey's stock is traded on the electronic market, NASDAQ, under ticker symbol "CASY".  The market opens at 9:30 a.m. EST Monday through Friday.  See http://www.nasdaq.com/reference/marketsite_facts.stm.

|  |  |
|---|---|
|  | employ? |
| Raymond Paré: | I will say, try to keep it as high as possible – everything over 36 is fine. I don't want to make the market drop because of me. And, go by your feeling and what you think. |
| Christopher Dale: | So you don't want to price to drop? |
| Raymond Paré: | No, but I want to maintain the price in order to materialize basically this gap in between my offer . . . <br><br> . . . <br> . . . and the actual market as much as possible. |
| Christopher Dale: | . . . I don't think that we should have any issue with that. But, and you don't mind that you'll be selling out of the toehold position? |
| Raymond Paré: | Nope, no. No because overall we made enough on the toehold, if I paid 36 and I'm able to sell it at 38. <br> . . . <br> It's the arbitrageurs, basically, that will lose. |
| Christopher Dale: | Okay, anything.  So basically, sell anywhere above 36? |
| Raymond Paré: | Yep, yep. |

[JX 12 at 1–2.]

The broker confirmed the feasibility of selling the Casey's toehold to maximize prices at 10:13 a.m.[5] [JX 13.] By 11 a.m., Couche-Tard had liquidated its holdings and was left

---

[5]According to Couche-Tard and National Bank Financial, several hundred thousand trades occurred:

| | | | | | |
|---|---|---|---|---|---|
| Sold | 200,000 @ | $37.9809 | from | 09:30:53 | until 09:34:47 |
| Sold | 100,000 @ | $38.6366 | from | 09:41:31 | until 09:43:35 |
| Sold | 100,000 @ | $38.4262 | from | 09:49:11 | until 09:55:22 |
| Sold | 300,000 @ | $38.3833 | from | 09:55:58 | until 10:05:52 |
| Sold | 200,000 @ | $38.4810 | from | 10:17:33 | until 10:22:11 |
| Sold | 1,075,000 @ | $38.5058 | from | 10:24:21 | until 10:53:55 |

with only 362 shares. The average sale price per share was $38.43, based upon several hundred thousand individual trades. [JX 14.] Couche-Tard's stated purpose in selling its Casey's shares was to realize a gain of approximately $14 million on its Casey's stock that it could then use to offset costs associated with Casey's acquisition.

Several hours after the Announcement became public, Mr. Myers responded to the Announcement by sending a public (and correspondingly, filing it with the SEC) response letter to Mr. Bouchard. [JX 13 at Ex. 99.1.] In this letter, he explained the Board's reasons for rejecting Couche-Tard's proposal stating, among other things, that Couche-Tard's proposal "significantly undervalues Casey's". Id. Throughout the day, Casey's stock continued to rise and it closed at $39.10 per share, with 15.5 million shares exchanged. [JX 3 at 1.]

### D. After the Tender Offer Announcement

Casey's Board responded to the Announcement by adopting a Rights Plan on April 16, 2010.[6] The Board also entered into a new employment agreement with Mr. Myers. His prior employment agreement expired on June 21, 2011—but this new agreement extended his tenure to April 30, 2013 at a base salary of $660,000. Other employment agreements were amended for ten of Casey's senior management on May 27, 2010, and for two more officers on June 1, 2010. These amendments extended their terms of employment for two

---

[6]The Rights Plan—also known as a "Poison Pill"—becomes exercisable by the Board on the earlier of two triggering conditions: (1) on such date Casey's learns a person has obtained the right to acquire beneficial ownership of 15 percent or more of outstanding common stock, or (2) on such date Casey's Board learns of a tender or exchange offer, which, if successful, would result in a person owning more than 15 percent of outstanding common stock. In either of these two scenarios, a person accumulating 15 percent or more of outstanding common shares becomes an "Acquiring Person" and the Board has the right to exercise the Poison Pill. The Poison Pill itself contains "flip-in" and "flip-over" provisions that make the outstanding common stock more expensive for an Acquiring Person to purchase. In the "flip-in" provision, an Acquiring Person would need to purchase thousands of Preferred Shares, and in the "flip-over" provision, the Acquiring Person's common shares become diluted.

years following a change of corporate control.

On June 2, 2010, Couche-Tard formally announced its cash tender offer[7] ("Offer") for $36.00 per share by filing its Schedule TO with the SEC. [JX 18.] In the Schedule TO, Couche-Tard disclosed that it was the beneficial owner of 362 shares of Casey's stock, and that it had sold "1,975,000 Shares [of Casey's stock] at a price of $38.43 per Share in an open market sale" on April 9, 2010. [JX 18 at 18, 31.]

On June 8, 2010, Casey's filed a Schedule 14D-9 with the SEC and stated that the Board had again rejected Couche-Tard's tender offer. [JX 21.] Casey's Board stated that a tender offer was still not in the best interests of maximizing shareholder value and recommended that shareholders reject the Offer. Moreover, the Board recommended that Casey's shareholders refuse to tender their shares to Couche-Tard at $36.00 per share. Casey's filed this motion on June 11, 2010 for a preliminary injunction to prevent Couche-Tard from proceeding with the Offer. [Dkt. No. 8; JX 23 at 1.] In late July, Casey's commenced a stock buyback plan for a portion of outstanding common stock.[8]

Couche-Tard amended its Schedule TO and increased its tender offer to $36.75 per share on July 22, 2010. [JX 29 at 2.] The Casey's Board thereafter met again on July 27, 2010 and then filed an amendment to its Schedule 14D-9, recommending that Casey's shareholders reject Couche-Tard's amended offer. [JX 30 at 3.] On August 2, 2010, Couche-Tard amended its Schedule TO to provide more detailed information as to the Casey's shares

---

[7]Acquiring all the outstanding shares is the first step in a proposed two-step process for Couche-Tard to gain control of Casey's. If Couche-Tard acquires 100 percent of the outstanding shares, Casey's will then merge with a wholly-owned subsidiary of Couche-Tard, ACT Acquisition Sub, Inc. The Offer is expressly conditioned on the Board's non-execution of the Poison Pill and Iowa's Business Combination Statute, Iowa Code § 490.1110, being made inapplicable.

[8]Casey's completed a buyback of a portion of its shares via a Dutch Auction tender offer on August 31, 2010. Investors oversubscribed and offered approximately 26.8 million shares at a price of $38.00 per share. Casey's purchased a pro-rated amount of approximately 49% of shares from each tendering shareholder, for an aggregate of 13,157,894 shares at a price of $38.00 per share. These shares represent 25.8% of outstanding common stock. Casey's General Stores, Inc., Current Report at Ex. 99.1 (Form 8-K) (Aug. 31, 2010).

it sold on April 9th: "Couche-Tard sold 1,975,000 Shares in a series of open market sales at a *weighted average price* of $38.43. . . . The sale of such Shares *occurred in the morning of April 9th*." [JX 31 at 4] (emphasis added). On September 1, 2010, Couche-Tard amended and restated its July 22, 2010 tender offer to reflect an increased offer price of $38.50 per share. Alimentation Couche-Tard, Inc., Tender Offer Statement (Amendment No. 14 to Schedule TO/A) (Sept. 1, 2010).[9]

Casey's responded with a press release on September 3, 2010, urging its shareholders to await a recommendation from the Board. Casey's General Stores, Inc., Solicitation/Recommendation Statement (Amend. No. 21 to Schedule 14D-9) (Sept. 3, 2010). The Board met on September 6, 2010 and again unanimously recommended that Casey's shareholders reject the new tender offer. Casey's General Stores, Inc., Solicitation/Recommendation Statement (Amend. No. 22 to Schedule 14D-9) (Sept. 7, 2010).

## II. ARGUMENT

Casey's seeks relief in the form of a preliminary injunction[10] requiring Couche-Tard to make the following amended disclosures to its Schedule TO: (1) that Couche-Tard was willing to sell Casey's stock at any price above $36.00 on April 9, 2010; (2) that Couche-Tard gave instructions to sell in order to protect its gain on its Casey's toehold because Couche-Tard did not know if it would complete the acquisition; and (3) that in giving the sell order, Couche-Tard recognized that "arbitrageurs"[11] would lose as a result of the sale.

---

[9]The Court obtained the SEC filings from September 1 and 3 from the SEC website.

[10]Casey's also alleges that Couche-Tard manipulated the market with its announcement of a tender offer on April 9, 2010 and subsequent sale of Casey's shares. However, the issue before the Court in this preliminary injunction motion is whether there was inadequate disclosure and insufficient amended disclosures.

[11]According to *Investopedia*, an "arbitrageur" is "[a] type of investor who attempts to profit from price inefficiencies in the market by making simultaneous trades that offset each other and capturing risk-free profits." Arbitrageur, Investopedia, http://www.investopedia.

Casey's argues that Couche-Tard's failure to make these material disclosures misled the market and investors as to Couche-Tard's willingness to consummate the acquisition. Existing shareholders should still have these disclosures, Casey's argues, even if the information has become less significant as a result of Couche-Tard's amended tender offers.

Couche-Tard asserts that the shareholders have all the material information that is required by law. Couche-Tard made public the fact that it sold its toehold position for an average weighted price at $38.43 on the morning of April 9, 2010. Couche-Tard admits that the decision to sell its toehold of Casey's shares in order to realize a gain may have been "unusual," but that it was a rational business decision. Further, it claims that the SEC does not require Couche-Tard to disclose its purpose in selling, its conversations with its broker, a price range of a sale, or anything before an actual tender offer is made.

### III. PRELIMINARY INJUNCTION STANDARD

In order for a court to grant preliminary injunctive relief, the movant has the burden of "establishing the propriety"of such an injunction. Baker Elec. Co-op, Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994) (citing Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 737 (8th Cir. 1989) (en banc)). This involves consideration of the four factors the Eighth Circuit set forth in Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc), which are: "(1) the threat of irreparable harm to the movant; (2) the state of balance between the harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Id. "[A] court should flexibly weigh the case's particular circumstances to determine 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th

---

com/terms/a/arbitrageur.asp.

Cir. 1987) (quoting Dataphase, 640 F.2d at 113).

While "[n]o single factor is dispositive," Lankford v. Sherman, 451 F.3d 496, 503 (8th Cir. 2006), the "most significant" of the four factors is whether the plaintiff is likely to be successful on the merits. Minn. Ass'n of Nurse Anesthetists v. Unity Hosp., 59 F.3d 80, 83 (8th Cir. 1995) (quoting S&M Constrs., Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir.), cert. denied, 506 U.S. 863 (1992)). The Eighth Circuit Court of Appeals has instructed district courts to first determine whether the movant has made a "threshold showing that it is likely to prevail on the merits" and to then "proceed to weigh the other Dataphase factors." Planned Parenthood Minn., N. Dakota, S. Dakota v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008). Accordingly, the Court considers all four factors in turn, beginning with Casey's likelihood of success on the merits.

**A. Likelihood of Success on the Merits**

The Court first determines whether Casey's is likely to successfully show that Couche-Tard failed to make required material disclosures to shareholders regarding its sale of Casey's stock. In support of its motion for preliminary injunction, Casey's alleges that Couche-Tard violated Section 14(e) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(e)), and it is this violation that Casey's seeks to enjoin.[12]

---

[12]In its motion, Couche-Tard argues that Casey's lacks standing to bring its Section 14(e) claim. The Court disagrees and finds that a target corporation does have standing to seek preliminary injunctive relief, as most courts have recognized an implied private right of action for the target to assert injunctive relief against the offeror. See Piper v. Chris-Craft Indus., Inc., 430 U.S. 1 (1977); Elec. Specialty Co. v. Int'l Controls Corp., 409 F.2d 937 (2d Cir. 1969) (both nontendering and target corporation have standing to complain of violation by offeror of provisions of Section 14(e) regulating the conduct of persons making or opposing stock tender offers and proscribing false or misleading statements in connection with such offers); Smallwood v. Pearl Brewing Co., 489 F.2d 579, 596 n.20 (5th Cir.), cert. denied, 419 U.S.873 (1974) ("a private right of action may be inferred from Section 14(e) . . . Not only do we thereby follow the overwhelming weight of authority, but we reaffirm the importance of private litigation to the effective enforcement of the securities laws."); Seaboard World Airlines, Inc. v. Tiger Int'l, Inc., 600 F.2d 355 (2d Cir. 1979) (recognizing the § 14(e) remedy but finding no substantive violation); Dan River, Inc. v.

12

In determining a likelihood of success on the merits, a court need not decide whether the movant will ultimately prevail. PCTV Gold, Inc. v. SpeedNet, L.L.C. 508 F.3d 1137, 1143 (8th Cir. 2007) (citing Glenwood Bridge, Inc. v. City of Minn., 940 F.2d 367, 371 (8th Cir. 1991)).  Instead, the movant must show only that he has a "fair chance" of prevailing or is "likely to prevail on the merits."[13]  Planned Parenthood, 530 F.3d at 732 n.4 (citing Doran v. Salem Inn, Inc. 422 U.S. 922, 931 (1975)) (adopting "likely to prevail on the merits" standard for preliminary injunctions instead of previous "substantial probability" standard). "[L]ikelihood of success on the merits requires that the movant find support for its position in governing law." Interbake Foods, L.L.C. v. Tomasiello, 461 F. Supp. 2d 943, 961 (N.D. Iowa 2006) (citations omitted).  Because determining a preliminary injunction is often "speculative", the "inquiry militates against any wooden or mathematical application of the test." United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998) (citing Calvin Klein, 815 F.2d at 503).

First, Casey's asserts that Couche-Tard's failure to make adequate disclosure violates Section 14(e) of the Exchange Act.  Section 14(e)[14] is part of the Williams Act and prohibits material misstatements or omissions in regards to tender offers.  Section 14(e) was modeled after Rule 10b-5 (17 C.F.R. § 240.10b-5), which was promulgated under section 10(b) of the

---

Unitex Ltd., 624 F.2d 1216 (4th Cir. 1980) (target corporation has standing to seek equitable relief).

[13]The court emphasized that the stricter standard of the "substantial probability" should still be used "where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute". Planned Parenthood, 530 F.3d at 732–33.

[14]Section 14(e) is a general anti-fraud provision, which provides in pertinent part:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

15 U.S.C. § 78n(e).

1934 Act. See, e.g., Panter v. Marshall Field & Co., 646 F.2d 271, 283 (7th Cir.), cert. denied, 454 U.S. 1092 (1981). Both sections 14(e) and 10(b) advocate the philosophy of full disclosure as embodied in the Exchange Act. See generally Sante Fe Indus., Inc. v. Green, 430 U.S. 462 (1977). Here, Casey's must establish there is a likelihood of success on the merits for the elements of a Section 14(e) violation, which are: (1) Couche-Tard's omission of facts renders its disclosures misleading; (2) the omissions were made with scienter; and (3) that the omission or misstatement was material. See Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 362 (2d Cir. 1973). In the event that material facts have been knowingly omitted, the Williams Act enables a target corporation to obtain corrective disclosures from a tender offeror who has disseminated allegedly false and misleading tender offer materials. Florida Commercial Banks v. Culverhouse, 772 F.2d 1513 (11th Cir. 1985). Subsequent disclosure can cure a failure to disclose, Consol. Gold Fields, PLC v. Anglo Am. Corp. of S. Africa, Ltd., 713 F. Supp. 1457, 1474 (S.D.N.Y. 1989) (disclosing potential conflicts of interest); Ronson Corp. v. Liquifin Aktiengesellschaft, 370 F. Supp. 597, 602 (offeror has the right to cure any defect in its offer), but not in all instances. See Polaroid Corp. v. Disney, 862 F.2d 987, 1005 (3d Cir. 1988) (misrepresentations in tender offer that offeror could consummate tender offer and not violate margin regulations were not cured by representations of offeror's counsel stating its intention not to proceed under circumstances subjecting it to violation of margin regulations).

      Section 14(e) requires "full and fair disclosure of all material facts . . . so that investors may have the benefit of all significant facts in making their investment decisions." Mo. Portland Cement Co. v. H.K. Porter Co., Inc., 535 F.2d 388, 393 (8th Cir. 1976). Couche-Tard must disclose all material facts necessary to make any statements about its tender offer accurate and not misleading. RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., 185 F. Supp. 2d 389, 400 n.10 (S.D.N.Y. 2002); Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co., Inc., 476 F.2d 687 (2d Cir. 1973) (target corporation in a section 14(e) claim must establish that omissions were material); Shamrock Assoc. v. Moraga Corp., 557 F. Supp.

198, 204 (D. Del. 1983) (1983) (tender offeror must disclose material facts in manner deemed not to be misleading); Revlon, Inc. v. Pantry Pride, Inc., 621 F. Supp. 804, 807-08 (D. Del. 1985) (once an offeror has definitively set on a course to acquire the target, disclosure must be made of all material facts). For tender offers, disclosure is important so that an investor may have "accurate disclosure of material facts . . .which in reasonable or objective contemplation might affect the value of the corporation's stock or securities." Feldbaum v. Avon Prods., Inc., 741 F.2d 234, 236 (8th Cir. 1984) (quoting Myzel v. Fields, 386 F.2d 718, 734 (8th Cir. 1967), cert. denied, 390 U.S. 951 (1968)).

Scienter is the next element in determining whether there has been a Section 14(e) violation. "Scienter is the 'mental state embracing intent to deceive, manipulate, or defraud.'" Pagel, Inc. v. SEC, 803 F.2d 942, 946 (8th Cir. 1986) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 N.12 (1976)); see also Schreiber v. Burlington N., Inc., 472 U.S. 1, 10 (1985) (section 14(e) is "modeled on the [same] antifraud provisions of Section 10(b) of the Act and Rule 10b-5 . . . which require proof of scienter."). Scienter must be pled with sufficient particularity, and facts must be presented that (1) establish motive and opportunity to commit fraud, or facts that (2) constitute circumstantial evidence of either reckless or conscious behavior, so as to give rise to strong inference of knowing or reckless misstatement or omission. In re Digital Island Sec. Litig., 357 F.3d 322, 328, 29 (3d Cir. 2004); Horizon Asset Mgmt., Inc. v. H & R Block, Inc., 580 F.3d 755, 761 (8th Cir. 2009) (scienter is "the defendant's intention to deceive, manipulate or defraud or the defendant's severe recklessness") (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007)); In re Eng'g Animation Sec. Litig., 110 F. Supp. 2d 1183, 1191 (S.D. Iowa 2000) (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 269 (2d Cir. 1993)). "While recklessness would satisfy the scienter requirement, mere negligence would not." Skydell v. Ares-Serono S.A., 892 F. Supp. 498, 501 (S.D.N.Y. 1995).

Finally, Casey's must show there is a sufficient likelihood that the facts Couche-Tard omitted from its pre-offer announcement were material. "Material facts include those which

affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." SEC v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997) (quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968) (en banc)). This includes facts "which in reasonable and objective contemplation might affect the value of the corporation's stock or securities." Id. at 849 (quoting List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965)); see also Scientific Computers, Inc. v. Edudata Corp., 599 F. Supp. 1092, 1098-99 (D. Minn. 1984) ("The standard . . . contemplate[s] . . . a showing of substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.") (quoting Prudent Real Estate Trust v. Johncamp Realty, Inc., 599 F.2d 1140, 1147 (2d Cir. 1979)). "Whether or not any particular fact is material is a determination which clearly cannot be made in a vacuum. Each individual case must be viewed as a discrete set of circumstances and judged on its own unique facts." Berman v. Gerber Prods. Co., 454 F. Supp. 1310, 1321–22 (W.D. Mich. 1978). But there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. TSC Indus., Inc. v. Northway, 426 U.S. 438, 449 (1976).

The Court looks first to the requirements of disclosure in the Schedule TO that Couche-Tard filed on June 2, 2010, as amended August 2, 2010, in order to determine whether Couche-Tard omitted material statements in its announcement to shareholders. The Schedule TO mandates the offeror to disclose certain information contemporaneous with a tender offer. 17 C.F.R. § 240.14d-100. For example, under Item 5, a third-party offeror—such as Couche-Tard—must disclose "Past Contacts, Transactions, Negotiations and Agreements" pursuant to 17 C.F.R. § 229.1005 with the target. Section 229.1005 requires the offeror to "[b]riefly state the nature and approximate dollar amount of any

16

transaction". 17 C.F.R. § 229.1005.

On June 2, Couche-Tard disclosed that it had sold 1,975,000 shares for $38.43. It amended this statement on August 2, to inform shareholders that it had sold the shares at a weighted average price of $38.43 in the course of a morning. Couche-Tard had no obligation to disclose its sale of stock before it formally commenced its tender offer. The Court recognizes the importance of full disclosure in the area of tender offers, but the facts before the Court suggest that Couche-Tard has not omitted to disclose material facts concerning its April 9, 2010 sale of Casey's stock. Couche-Tard, in its August 2 filing, provided sufficient information to shareholders in its Schedule TO disclosures.

Further, the Court finds that Couche-Tard's willingness to sell its shares on April 9, 2010, at any price above $36.00 is not a material fact that would affect the "total mix" of information available to shareholders. Section 14(e) requires disclosure of material facts, not opinion, conjecture, speculation, or business strategy.

Additionally, the Court finds that Couche-Tard's omission of more detail about its stock sales lacked scienter. Couche-Tard complied with the requirements of disclosure when making a tender offer pursuant to Schedule TO. Whether it was a good strategic business decision for Couche-Tard to sell its toehold position in Casey's is not a question before this Court. And Couche-Tard will be called on later to defend against claims of market manipulation on April 9, 2010. It may have been confusing to investors and the market for Couche-Tard to sell its toehold position while simultaneously attempting to acquire Casey's. But it remains the investors prerogative to decide how to react to this behavior, rather than for the Court to mandate further disclosure.

Given the facts of the present case, the Court believes that Casey's has not met the burden of proving a likelihood of success on the merits of the Section 14(e) disclosure claim.

**B. Irreparable Harm and Balancing the Harm**

The Court next considers the question of whether Casey's has shown there is a threat of irreparable harm if the injunction is not granted, and then balancing the alleged irreparable harm. "Irreparable harm" concerns the harm or potential harm to the movant based on the opposing party's threatened or anticipated conduct. Dataphase, 640 F.2d at 114. A movant may show irreparable harm by demonstrating that there is no adequate remedy at law. Gen. Motors Corp. v. Harry Brown's L.L.C., 563 F.3d 312, 319 (8th Cir. 2009); Reynolds v. Rehabcare Group E., Inc., 531 F. Supp. 2d 1050, 1056 (S.D. Iowa 2008) (citing Taylor Corp. v. Seasons Greetings, L.L.C., 403 F.3d 958, 967 (8th Cir. 2005)). A court must deny a motion for preliminary injunction if the movant cannot show the threat of irreparable harm. Thrasher v. Grip-Tite Mfg. Co., Inc. 535 F. Supp. 2d 937, 944 (S.D. Iowa 2008) (quoting Baker Elec., 28 F.3d at 1472); Blue Moon Enter., L.L.C. v. City of Bates City, Mo., 441 F.3d 561, 561 (8th Cir. 2006). Then, the "balance of harms" analysis involves weighing the harm resulting to each party from granting or denying the injunction, Dataphase, 640 F.2d at 114, and a court is not limited to balancing the harm merely of the parties, but can look at potential harm to interested third parties. Baker Elec., 28 F.3d at 1473. See also B&D Land and Livestock Co. v. Conner, 534 F. Supp. 2d 891, 909 (N.D. Iowa 2008) (citations omitted). The balance of harms must tip decidedly toward Casey's in order to justify issuing a preliminary injunction. Lynch Corp. v. Omaha Nat'l Bank, 666 F.2d 1208, 1212 (8th Cir. 1981); Mediacom Comm. Corp. v. Sinclair Broadcast Group, Inc., 460 F. Supp. 2d 1012, 1021 (S.D. Iowa 2006).

Here, the parties dispute whether irreparable harm will result if Casey's shareholders tender their shares without an informed vote. Because the Court has already found that the omitted facts were not material, the shareholders are adequately informed and irreparable harm will not result. Likewise, because irreparable injury will not result, the balance of harms analysis weighs in favor of not granting the preliminary injunction.

### C. Public Interest

Lastly, the Court considers whether the public interest would be served in granting a preliminary injunction to Casey's. Dataphase, 640 F.2d at 113. The Court finds there is no public purpose in requiring further disclosure when that is not mandated by law. See Life Investors, Inc. v. Ago Holding, N.V., 1981 WL 15483 at *5 (8th Cir. 1981) (per curiam) ("the public interest is clearly served by affording stockholders the information that they need to make a fully informed decision as to whether to cast their lot with AGO or to tender their stock and invest their money elsewhere."). The public knows that Couche-Tard sold its toehold position in Casey's while it simultaneously announced an interest in acquiring the company via a cash tender offer. Requiring further disclosure would not affect a stockholder's decision to tender his shares to Couche-Tard because public disclosures made on June 2 and August 2 adequately disclose the terms of that stock sale.

## IV. CONCLUSION

In conclusion, the Court finds that Casey's has not satisfied the Dataphase factors of proving a likelihood of success on the merits of a Section 14(e) disclosure violation to order Couche-Tard to make additional amended disclosures. Couche-Tard has made the relevant material disclosure that it sold 1,975,000 shares of Casey's stock at a weighted average price of $38.43, on the same morning that Couche-Tard announced its intention to acquire 100 percent of outstanding shares at a price of $36.00 per share. Couche-Tard admits that it was "unusual" to sell virtually all of its stock in Casey's on the same morning that its tender offer drove the price of that stock up approximately $7.00. It will have to answer later to Casey's claim that it profited from market manipulation through these sales.

However, for purposes of Schedule TO disclosures, it was enough for Couche-Tard to tell investors when it sold the shares, the number of shares it sold, and the amount by which it profited, letting investors draw their own conclusions from this information.

Upon the foregoing,

**IT IS ORDERED**

Plaintiff Casey's General Stores, Inc.'s Motion for Preliminary Injunction [Dkt. No. 8] is denied.

**DATED** this 8th day of September, 2010.

_____
JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA